SEGUROS "ILLIMANI" S.A., Empresa Nacional de Fundiciones, Derby Y Cia, Inc. and S.W. Shattuck Chemical Co., Plaintiffs,

v.

M/V POPI P, her engines, boilers, etc., Nimipet Corp., Lineas Navieras Bolivianas, Compania Sud Americana De Vapores and Chilean Line, Inc., Defendants.

COMPANIA SUD AMERICANA DE VAPORES and Lineas Navieras Bolivianas, Defendants and Third Party Plaintiffs,

v.

UNIVERSAL MARITIME SERVICE CORP., Third Party Defendant.

No. 86 Civ. 7369 (MP).

United States District Court,
S.D. New York.

April 13, 1990.

Symmers, Fish & Warner, New York City by William Warner, for plaintiffs.

Grainger, Tesoriero & Bell, New York City by Celestino Tesoriero, William E. Bell, for third party defendant.

Kirlin, Campbell & Keating, New York City by J. Scot Provan, Robert A. Milana, for defendants and third party plaintiffs.

## DECISION and OPINION

MILTON POLLACK, Senior District Judge.

### SUMMARY

Having heard and seen the witnesses and considered all documentary evidence and having evaluated all of the facts and circumstances herein, I decide and find as follows:

The Carriage of Goods by Sea Act (COGSA) 46 U.S.C.App. § 1300, et seq., applies to the shipment and the loss of the tin ingots involved therefrom.

The shipment could not be mistaken to be other than a shipment of 600 packages or bundles into which 8,996 ingots were packaged. The bundles or packages, each consisting of 15 ingots (except one package of 11), were each separately bound by steel straps. The two containers herein involved 67 packages or bundles containing 1,005 ingots, packaged as mentioned, and were shipped that way. The bills of lading and their content must be read and understood in the light of the clear intent that 600 bundles in total were involved which is supported by the collateral evidence that the quantity references in the bills of lading were intended to embrace packages or bundles wrapping 15 ingots per package or bundle, and individual ingots were not intended to be individual, separate packages.

The ingots were aboard the rail cars referred to in the evidence; were initially stored in Warehouse No. 5 at Arica, Chile; were packaged into 600 bundles or packages; were delivered to and stored in steel strapped packaged or bundled groups and placed in 18 containers; all bundles or packages were separately strapped with steel bands around each bundle; were all loaded on the Popi at Arica, Chile; remained intact during its voyage to New York; were off-loaded from the ship intact and placed intact in the custody and control of the stevedore, Universal Maritime Services Corp.; that 67 packages of ingots shipped and so off-loaded involving a total of 1,005 ingots were found to be missing; the container had been opened and invaded without breaking the seals; the packages of ingots were removed and not delivered to the consignees in New York as a result of the fault of the stevedore. From the evidence presented and the legitimate inferences therefrom, I find that the plaintiffs and third-party plaintiffs have sustained the burden of proof that the removal of the ingots occurred while the containers were in the custody and control of the stevedores. The evidence of the third-party defendant did not satisfactorily or credibly meet or overcome the *prima facie* proof of the third-party plaintiffs that the loss occurred while the containers were in the possession or under the control of the stevedores. The issues of credibility involved with respect to the loss are resolved in favor of the plaintiffs and third-party plaintiffs against the third-party defendant.

### OPINION

#### 1. *Jurisdiction*

The claims against the ship, carriers and charterers fall within the scope of this Court's admiralty jurisdiction. *See* 28 U.S.C. § 1333(1).[1] However, any claim against Universal Maritime arose while the cargo was on land and is grounded on state law and is not within federal admiralty jurisdiction. *See, Roco Carriers Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1294 (2d Cir.1990). The validity of jurisdiction over a third-party defendant is grounded in the concept of pendent party jurisdiction. The Second Circuit has recently reaffirmed the availability of pendent party jurisdiction in admiralty cases even in light of the Supreme Court's holding in *Finley v. United States*, — U.S. —, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989).

In light of the broadly worded jurisdictional grant over admiralty cases and the "strong admiralty policy in favor of pro-

---

1. "The district courts shall have original jurisdictional, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all remedies to which they are otherwise entitled . . ."

viding efficient procedures for resolving maritime disputes," *In re Oil Spill*, 699 F.2d [909] at 914 [ (7th Cir.1983) ], we see no reason at this juncture to depart from the established rule of this Circuit that pendent party jurisdiction is available in the unique area of admiralty.

*Roco Carriers*, at 1297.

2. *COGSA*

  a. Applicability

■ The Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300–1315, governs the rights of the parties while the cargo is on the ship.

The plaintiffs argue that COGSA should not limit its recovery in this case if the loss occurred before loading or after discharge.

Paragraph 2(a) of the bill of lading states:

If this Bill of Lading is issued exclusively for the carriage of goods by sea the carrier shall be responsible subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936 in case of a carriage of goods from ports of the United States, or, in case of a carriage from ports of Canada, subject to the provisions of the Water Carriage of Goods Act of Canada, approved August 1, 1936, and the said provisions shall be deemed to be incorporated herein. The provisions stated in the said Acts shall also govern before the goods are loaded on and after they are discharged from the ship, however, restricted to the time when the goods are in the actual custody of the carrier. The carrier shall not be liable in any capacity whatsoever while the goods are not in his actual custody.

Plaintiffs argue that the bill of lading only extends COGSA to cover these periods in voyages *from* the United States.

When read in conjunction with COGSA, however, it is clear that ¶ 2(a) extends coverage on all voyages. COGSA requires bills of lading for voyages from the United

States to contain a statement expressly including COGSA's terms.[2] The first sentence of ¶ 2(a) does exactly this. The second sentence then states at what other times COGSA will apply. The plaintiffs' argument that the first sentence modifies the second is not persuasive. The second sentence states that COGSA "shall *also* govern" before loading and after discharge. (Emphasis added). It is an additional term, not one dependent on the sentence before it.

The bills of lading also contain a so-called "Himalaya" clause extending coverage to "servants, employees and agents of the carrier as well as of such independent contractors (including their servants, employees and agents) whose services the carrier from time to time may engage in the operation of the vessel or any other means of transportation including loading, discharging and all services in connection herewith." Stevedores are included in the term "independent contractor."

Whether a bill of lading extends limitations of liability to stevedores depends on whether "the clarity of the language used expresses such to be the understanding of the contracting parties." *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. [297] at 305 [79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959) ] ... Two circuits have recently held that a bill of lading mentioning independent contractors clearly includes stevedores. *Bernard Screen Printing Corp. v. Meyer Line*, 464 F.2d 934, 936 n. 1 (2d Cir. 1972), cert. denied, 410 U.S. 910 [93 S.Ct. 966, 35 L.Ed.2d 272] ... (1973); *Seacrest Machine Corp. v. S.S. Tiber*, 450 F.2d 285, 287 (5th Cir.1971). The language of the district court in *Bernard Screen* is instructive:

To exclude "stevedores," who are independent contractors, from the scope of the more inclusive term would, in effect, be holding that parties by using

---

**2.** "... *Provided further*, That every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea from ports of the United States, in foreign trade, shall contain a statement that it shall have effect subject to the provisions of this chapter." 46 U.S.C.App. § 1312.

the more inclusive term had accomplished the opposite result.

328 F.Supp. [288] at 290.

*Tessler Bros. (B.C.) Ltd. v. Italpacific Line,* 494 F.2d 438, 446 (9th Cir.1974).

Plaintiffs also make the claim that even if COGSA was extended by the bills of lading, the limitation is invalid under state law. Although plaintiffs are correct that the extension of COGSA is valid only as a contract term and not of its own force as a statute, *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 315–16 (2d Cir.1983) ("Since state law governs, provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law."), *cert. denied, sub nom., Global Terminal & Container Svces., Inc. v. Colgate Palmolive Co.,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984), plaintiffs are in error when they state that *Colgate Palmolive* held such provisions invalid in New York. In fact, *Colgate Palmolive* held such provisions invalid under New Jersey law when conversion takes place. The port facilities in this case are located in New York and, in New York, the $500 limitation is valid for bailees in negligence cases.[3] *See, Leather's Best, Inc. v. Tidewater Terminal, Inc.,* 346 F.Supp. 962, 967–68 (E.D.N.Y.1972).

b. Limitation

Section 4(5) of COGSA limits the liability of the carrier to a maximum of:

$500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C.App. § 1304(5).

■ There are three alternatives here for the definition of "package:" 1) each container is a package; 2) each ingot is a package; or 3) each bundle is a package.

---

**3.** Negligence, rather than conversion, is the applicable theory of liability vis a vis Universal Maritime in this case because it was functioning as a stevedore, not as a warehouseman. *Cf.,*

If no appropriate package exists, then recovery will be based on the customary freight unit. *See, Mitsui & Co., Ltd. v. American Export Lines, Inc.,* 636 F.2d 807, 822 (2d Cir.1981) ("If the ingots were not shipped in packages ... the $500 limit would apply 'per customary freight unit'.").

It is clear that the container is not the appropriate "package" in this case.

[S]ince the prevalent large metal shipping container furnished by a carrier is "functionally part of the ship," *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir.1971), and classification of it as a "package" would violate the purpose of § 4(5) by permitting the carrier to limit its liability unduly, we have refused to hold a shipping container to be a COGSA package, absent a clear agreement between the parties to that effect, at least so long as "its contents and the number of packages or units are disclosed." *Mitsui & Co., Ltd. v. American Export Lines, Inc.* ... 636 F.2d at 821; *accord, Smythgreyhound v. M/V "Eurygenes,"* 666 F.2d 746, 753 (2d Cir. 1981).

*Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam",* 759 F.2d 1006, 1012–13 (2d Cir.) *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985). Although the number is in dispute, it is clear that the "contents and the number of packages or units" was disclosed and the parties did not make a "clear agreement" among themselves.

The number of "packages" is also not a difficult question. The *Binladen* case sets out the analysis to be followed:

At the outset we are governed by some basic principles that have been judicially developed for resolution of issues of the type before us. The first of these, rather obvious, is that the touchstone of our analysis should be the contractual agreement between the parties, as set forth in the bill of lading. *See Allied International American Eagle Trading Corp.*

---

*Colgate Palmolive,* 724 F.2d at 316 ("we cannot agree with Global's contention that it was only a stevedore since, by its own admission, the goods were lost while stored in its warehouse.")

*v. S.S. "Yang Ming"* ... 672 F.2d [1055] at 1061 [ (2d Cir.1982) ] ... Entries on the bill of lading are thus important evidence of the intent of the parties to the shipping contract, *see Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 335 (2d Cir. 1972); *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts–Gesellschaft,* 375 F.2d 943, 946 (2d Cir.), *cert. denied,* 389 U.S. 831 [88 S.Ct. 97, 19 L.Ed.2d 89] ... (1967), and the declaration on the bill may bind a shipper even when the contents of the shipment diverge from the description on the bill. ... Secondly, no controlling definition of the term "package" has been judicially developed other than the requirement that it be the result of some "preparation [of the cargo item] for transportation ... which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Aluminios Pozuelo Ltd. v. S.S. Navigator* ... 407 F.2d [152] at 155 [ (2d Cir.1968) ].

759 F.2d at 1012.

All the parties in this dispute have put forward arguments on what effect the number "600" in the column titled "number of pkgs." on the bills of lading should have and what effect the number of "bundles" typed on the bottom of the bills should have. The plaintiffs argue that the 600 refers to the individual ingots. They refer to three of the bills of lading which through happenstance use the figure "600" in referring to the ingots and say that "600" covers only the number of ingots thereon. In fact, 600 happens also to be the total number of bundles involved in the 16 bills of lading. The defendants and third party defendants argue that the faces of the bills of lading covering the entire shipment show that the individual ingots were bundled and strapped in bands covering 15 ingots to a bundle.

However, while on their faces the three selected bills of lading out of the entire group of 16 of them might be ambiguous, when considered in conjunction with all shipping documents taken together it becomes abundantly clear that the total number of ingots shipped were packaged in 600 bundles and were not considered individual packages.

The appropriate limitation of liability is thus $500 per package × the 67 bundles which were lost.

### 3. *Entity Liable for the Loss*

■ Plaintiffs have made out a prima facie case under COGSA by providing the Court with the bills of lading for the lost ingots. *See,* e.g., *Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 429 (2d Cir. 1962):

> Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1301[sic] et. seq., here applicable, a shipper makes out a prima facie case by proving that his goods were delivered to the carrier in good condition and were outturned damaged or not at all; the burden then falls upon the carrier to bring itself within an excepted clause or to prove it exercised due diligence to avoid and prevent the harm;

and 46 U.S.C.App. § 1303(4), COGSA § 3(4):

> ... a bill of lading shall be prima facie evidence of the receipt of the cargo by the carrier of the goods as therein described ...

None of the exceptions of 46 U.S.C.App. § 1304(2) are applicable in this case nor have the defendants presented any evidence tending to rebut plaintiffs' prima facie case.

The fact that the goods were loaded onto the ship in Arica was amply documented by both live witnesses at trial and by numerous documents signed by the stevedores in Arica.[4] *Cf. Morton v. Berman Enterprises, Inc.,* 669 F.2d 89 (2d Cir.1982) (Court distinguishes *Stein Hall & Co. v. S.S. Concordia Viking,* 494 F.2d 287 (2d Cir.1974) on grounds that proof of loading was lacking.)

The shipment was turned over by the ship to its stevedores. Universal Maritime, as stevedore, "gave an implied warranty of workmanlike service competently to perform the carrier's statutory and contractu-

---

**4.** These include packing lists, tarjas de estiba and container inspection reports.

al obligations for the discharge of cargo." *Stein Hall & Co. v. S.S. Concordia Viking,* 494 F.2d 287, 290 (2d Cir.1974). This warranty was breached when the contents of the containers were negligently lost during the stevedores' control and handling of the containers. *See, e.g., Eutectic Corporation v. M/V Gudmundra,* 367 F.Supp. 681, 686 (S.D.N.Y.1973) ("Failure to account for the missing [items] is a breach of such warranty of workmanlike service. *David Crystal Inc. v. Cunard S.S. Co.* ... 339 F.2d [295] at 299 [ (2d Cir.1964) ] ... Liability must be based on the ordinary tort standard of negligence.").

Universal Maritime did not give any credible explanation of what occurred to the cargo in its control. Universal Maritime's failure to give an explanation gives rise to a presumption that it was negligent. *See, Stein Hall,* 494 F.2d at 290.

As bailee of an unexplained lost cargo, Universal Maritime is liable for damages. *See Id.* at 293:

> In *David Crystal, supra* [339 F.2d 295 (2d Cir.1964) ], this court said, "the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions." 339 F.2d at 298. This applies equally well to mysterious disappearances of cargo in the custody of the stevedore/terminal operator.

### 4. *Rule 14*

Plaintiff asserted an admiralty or maritime claim within the meaning of Rule 9(h) and the defendants, as third party plaintiffs, brought in Universal Maritime as a third party defendant under Rule 14(c), Fed.R.Civ.P.

The action then proceeded under the Rule as if the plaintiffs had commenced it against the third-party defendant as well as the third-party plaintiffs.

Accordingly, judgment will be entered against the third-party defendant in favor of the plaintiffs and judgment of dismissal will be granted in favor of the defendants on the claim of plaintiffs against defendants.

### Additional Findings of Fact

1. In November 1985, Empresa Nacional de Fundiciones (ENAF) shipped 8,996 tin ingots by rail from La Paz, Bolivia to Arica, Chile.

2. At Arica, Empresa Portuarias de Chile (EMPORCHI), the port authority for warehouses, equipment and labor at Arica, discharged the 8,996 tin ingots from the rail cars, tallied them, and stored them in EMPORCHI Warehouse No. 5 at Arica, Chile.

3. At the request of the CSAV and LINABOL's agents, Sudamericana Agencias Aereo y Maritimo (SAAM), and under the direction, supervision and control of EMPORCHI, the 8,996 tin ingots, in 600 bundles or packages, were stuffed into 18 containers on November 27, 1985 under the surveillance of the Bolivian Customs Authority, Administracion Autonoma de Almacenes Aduaneros de Bolivia (AADAA). With the exception of one bundle containing 11 ingots, all the bundles contained 15 ingots. Each bundle of tin ingots was strapped with steel bands.

4. The 18 containers were loaded onto the POPI P at Arica, Chile, with 12 containers stowed below deck in the Lower Hold and Tween Deck of Hatch No. 2, another four containers stowed in the Tween Deck, forward of Hatch No. 3, and two containers stowed on the deck of Hatch No. 2, starboard and carried to New York.

5. 16 bills of lading, dated November 28, 1985, numbered 1 through 16, were issued for the 8,996 tin ingots.

6. Plaintiff, Derby Y Cia, Inc., 1221 Avenue of the Americas, New York, NY 10020, was the consignee and notify party in the bills of lading numbered 1 through 8, all dated November 28, 1985, for carriage from Arica, Chile to New York in the M/V POPI P.

7. Plaintiff, S.W. Shattuck Chemical Company, P.O. Box 2526, Grand Central Station, New York, NY, was the notify party in the bills of lading numbered 9

through 16, all dated November 28, 1985, for carriage from Arica, Chile to New York in the M/V POPI P.

8. Plaintiff, Seguros "Illimani" S.A. (SEGUROS), Calle Loayza, Casilla 133, Edif. Mcal. de Ayacucho, Piso 10, La Paz, Bolivia, insured the 8,996 tin ingots described in the relevant 16 bills of lading.

9. Defendant, Nimipet Corp., c/o Petzetakis, Menelaos, S.A., Kifissou 103, Athens, Greece, was and is (1) a foreign corporation organized and existing under and by virtue of the laws of Greece, and (2) the owner and operator of the M/V POPI P which was under charter to CSAV in November/December 1985.

10. Defendant, Lineas Navieras Bolivianas (LINABOL), Edificio Esperanza, Avenida Mariscal Santa Cruz, 6 Piso, La Paz, Bolivia, was and is (1) a foreign corporation organized and existing under and by virtue of the laws of Bolivia engaged in the transportation of goods, *inter alia*, from ports on the west coast of South America to ports on the east coast of the United States, (2) was the subcharterer, the space charterer, of the M/V POPI P at the relevant time, and (3) issued the 16 bills of lading for 8,996 ingots of tin.

11. Defendant, Compania Sud Americana De Vapores (CSAV), Calle Blanco 895, Casilla 49–V, Valparaiso, Chile, was and is (1) a foreign corporation organized and existing under and by virtue of the laws of Chile engaged in the transportation of cargo, between, *inter alia*, ports on the west coast of South America and ports on the east coast of the United States, and (2) was the time charterer of the M/V POPI P at the relevant time.

12. At the times mentioned in the complaint, CSAV was the charterer of the POPI P and as disponent owner of the POPI P, it space chartered the ship to LINABOL.

13. Defendant, Chilean Line, Inc., a Delaware Corporation, One World Trade Center, Suite 3861, New York, NY 10048, was and is the agent of LINABOL and CSAV as disclosed principals.

14. Third-party defendant Universal Maritime Service Corp., One Broadway, New York, NY 10004, was and is a New York corporation that provided terminal stevedoring services for defendants relating to the tin ingots at New York.

15. U.M.S. operates a marine terminal known as Red Hook Marine Terminal, Brooklyn, NY.

16. The POPI P sailed from Arica on or about November 28, 1985, arriving at the Port of New York at Red Hook Terminal on or about December 13, 1985.

17. The 8,996 tin ingots described in the 16 bills of lading were manifested in the United States Customs Cargo Declaration for the POPI P entered at the Customs House in New York in December 1985.

18. On discharge at Red Hook Terminal, all 18 containers moving under Arica/New York Bills of Lading 1–16 were delivered into the possession and control of the terminal operator and third-party defendant, U.M.S.

19. On December 16, 1985, the containers with the original seals intact were taken to the stripping area at the north end of Pier 11 in the Red Hook Terminal for stripping.

20. In the presence of security guards, checkers, surveyors and representatives of the third-party plaintiff and U.M.S., the original intact seals on containers CTIU 289674–5 and CTIU 196134–2 were cut, the container doors were opened and the containers were found to be empty.

21. 720 tin ingots under bills of lading numbers 1 and 3, and 285 tin ingots under bill of lading number 13 were not delivered to the consignees at New York.

22. The amount that Seguros Illimani paid for the 1,005 tin ingots that were not delivered to the consignees at New York on December 13, 1985, was $462,104.10.

23. Derby & Co., Inc. was the holder of bills of lading numbers 1 through 8. S.W. Shattuck Chemical Company was the holder of bills of lading numbers 9 through 16. Shattuck paid Chilean Line Inc. freight of $23,290.18. Derby paid Chilean Line freight of $23,465.36. R. Markey & Sons,

Inc. received as fees for weighing at Red Hook Terminal (a) 3,911 ingots at 307,116 pounds net, $1,807.00 from Shattuck, and (b) 3,780 ingots at 277,642 pounds net, $1,638.00 from Derby. Shattuck paid ENAF a balance of $142,545.06 (i.e., $1,148,613.84, less ocean freight of $23,-290.18, less weighing costs of $1,807, less provisional payment of $974,999.73, and less interest on provisional payment of $5,971.87). Derby paid ENAF a balance of $24,894.90 (i.e., $1,038,381.08 less ocean freight of $23,465.36, less weighing costs of $1,638, less provisional payment of $982,365.83, less interest on provisional payment of $6,016.99).

### Conclusion

Plaintiffs are entitled to recover from the third-party defendant the amount of $33,-500. ($500 per package × 67 bundles lost), with interest from December 16, 1985 and costs to be taxed by the Clerk; and defendants are entitled to dismissal of the complaint, with costs to be paid by the third-party defendant, to be taxed by the Clerk.

The foregoing shall constitute the findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.