929 F.2d 89
 1991 A.M.C. 1521
 SEGUROS "ILLIMANI" S.A., Empresa Nacional de Fundiciones,
Derby & Cia, Inc., and S.W. Shattuck Chemical
Company, Plaintiffs-Appellants Cross-Appellees,
v.
M/V POPI P, her engines, boilers, etc., Nimipet Corp.,
Lineas Navieras Bolivianas, Compania Sud Americana
de Vapores, and Chilean Line Inc.,
Defendants-Appellees.
COMPANIA SUD-AMERICANA DE VAPORES and Lineas Navieras
Bolivianas, Defendants and Third-Party Plaintiffs-Appellees,
v.
UNIVERSAL MARITIME SERVICE CORP., Third-Party
Defendant-Appellee Cross-Appellant.
 Nos. 418, 573 Dockets 90-7554, 90-7586.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1990.
Decided April 1, 1991.
 
 William Warner, New York City (Symmers, Fish & Warner, New York City, on the brief), for plaintiffs-appellants cross-appellees.
 J. Scot Provan, New York City (Robert A. Milana, Kirlin, Campbell & Keating, New York City, on the brief), for defendants and third-party plaintiffs-appellees.
 Celestino Tesoriero, New York City (James M. Leonard, Grainger, Tesoriero & Bell, New York City, on the brief), for third-party defendant-appellee cross-appellant.
 Before NEWMAN and PRATT, Circuit Judges, and OWEN, District Judge.*
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal and cross-appeal from the April 25, 1990, judgment of the District Court for the Southern District of New York (Milton Pollack, Judge) concern a stevedore's liability and the measure of damages for 1,005 tin ingots shipped aboard the M/V POPI P from Arica, Chile, and stolen while in the control of the stevedore. Judge Pollack required third party defendant Universal Maritime Service Corp. ("Universal"), a stevedore, to indemnify, for breach of its implied duty of workmanlike service, defendants M/V POPI P, her engines, boilers, etc., Nimipet Corp., Lineas Navieras Bolivianas (LINABOL), Compania Sud Americana de Vapores (CSAV), and Chilean Line, Inc. (collectively "carriers") for the loss. However, the recovery of plaintiffs Empresa Nacional de Fundiciones, Seguros "Illimani" S.A., Derby & Cia, Inc., and S.W. Shattuck Chemical Co. (collectively "shippers") from Universal was limited to $33,500, plus interest, pursuant to a clause in the bills of lading that incorporated the $500 per "package" liability limitation provision of the Carriage of Goods by Sea Act ("COGSA"). Plaintiffs appeal from the limitation of damages and the third party defendant cross-appeals from the determination of liability.
 
 Background
 
 2
 The 1,005 missing ingots formed part of a shipment of 8,996 ingots, organized into 600 steel-strapped bundles, each containing 15 ingots.[1] Plaintiff Empresa Nacional de Fundiciones ("ENAF"), shipped the ingots from La Paz, Bolivia, to Arica, Chile. Empresa Portuarias de Chile, Chile's port authority, temporarily stored the ingots and supervised their preparation by Sudamericana Agencias Aereo y Maritimo (SAAM) for the voyage to New York. Acting as an agent for defendants Lineas Navieras Bolivianas ("LINABOL") and Compania Sud Americana de Vapores ("CSAV"), SAAM loaded the ingots into 18 shipping containers, which were placed onto the M/V POPI P. LINABOL and CSAV were the space and time charterers of the POPI P. Sixteen bills of lading, numbered 1 through 16, were prepared for the 8,996 ingots.
 
 
 3
 Upon its arrival at the Port of New York on December 13, 1985, the POPI P discharged the ingots into the care of third-party defendant Universal Maritime Service Corp. ("Universal"), operator of Red Hook Terminal and stevedore for defendants Nimipet Corp., the owner and operator of the M/V POPI P, LINABOL, CSAV, and Chilean Line, Inc., an agent of LINABOL and CSAV. When opened three days later, two of the containers, which should have held 1,005 ingots organized into 67 steel-strapped bundles, were found to be empty. The missing shipment included 720 ingots under bills of lading nos. 1 and 3 and 285 ingots under bill of lading no. 13.
 
 
 4
 ENAF, Seguros "Illimani" S.A., the insurer of the missing ingots, Derby & Cia, Inc., the holder of bills of lading nos. 1 and 3, and S.W. Shattuck Chemical Company, the holder of bill of lading no. 13 brought suit on September 25, 1986, invoking the admiralty jurisdiction of the District Court for the Southern District of New York. The plaintiffs sought to recover from the carriers $463,934.58, an amount equal to the market value of the missing ingots. CSAV and LINABOL in turn demanded full indemnification from Universal in a third-party complaint, pursuant to Universal's agreement to provide terminal facilities and terminal and stevedore services, or in the alternative that Universal be held directly liable to the shippers pursuant to Fed.R.Civ.P. 14(c). Though never directly sued by the plaintiffs, Universal filed an answer with counterclaim to the plaintiffs' complaint. Universal added separate counterclaims in its answer to CSAV and LINABOL's third-party complaint. The District Court (John E. Sprizzo, Judge) initially denied summary judgment motions of defendants and the third-party defendant. The case was subsequently reassigned to Judge Pollack for trial.
 
 
 5
 After a bench trial, Judge Pollack found that "the removal of the ingots occurred while the containers were in the custody and control of the stevedores," 735 F.Supp. 108, 109 (S.D.N.Y.1990), but held that the defendant carriers bore the initial responsibility for the loss, id. at 112. Because the ingots were stolen while in its custody, Universal was required to indemnify the defendants for breach of its implied warranty of workmanlike service. Id. at 113.
 
 
 6
 The plaintiffs' recovery, however, was limited by Section 4(5) of COGSA, 46 U.S.C. Sec. 1304(5) (1988), to $500 for each of the 67 steel-strapped bundles that were lost, for a total of $33,500, plus interest. In reaching this conclusion, Judge Pollack first rejected the plaintiffs' contention that the incorporation of COGSA's limitation of liability provision in the bills of lading violates public policy. Id. at 111. Then, examining the language of the bills of lading "in conjunction with all shipping documents taken together," id. at 112, Judge Pollack held that each bundle of 15 ingots, rather than each of the individual ingots, constituted a COGSA "package." Id.
 
 
 7
 On their appeal, plaintiffs primarily contend that each ingot constitutes the appropriate COGSA "package." Universal contends on its cross-appeal that the New York state law of bailments governs its liability to the shippers, that New York law requires a showing of negligence on the part of a stevedore, and that there was no such finding in this case.
 
 I. Universal's liability
 
 8
 Admiralty, rather than state law, determines a stevedore's liability as indemnitor for losses suffered by the carriers. Our cases establish that state law governs a shipper's tort claim against a terminal operator. See National Resources Trading, Inc. v. Trans Freight Lines, 766 F.2d 65, 68 (2d Cir.1985); Colgate Palmolive Co. v. S/S Dart Canada, 724 F.2d 313, 315 (2d Cir.1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 808 (2d Cir.1971). This Circuit has yet to decide whether and under what circumstances a shipper's tort claim against a stevedore would bear a sufficient nexus to maritime activities to fall within admiralty jurisdiction, see East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and we need not reach that question in this case. The District Court did not hold Universal liable based on a direct claim by the shipper. Rather, the ruling that the carriers are primarily liable, under admiralty law, for the loss of the ingots, a ruling that the carriers did not contest by cross-appeal, provides the basis for Universal's liability. Having contracted with Universal for stevedoring services, the carriers have an indemnity claim for losses that occurred while Universal performed stevedoring services; the claim arises from the warranty of workmanlike service implied by admiralty law from a carrier's contract with its stevedore.[2] See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 132-34, 76 S.Ct. 232, 236-37, 100 L.Ed. 133 (1956); Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co., 301 F.2d 741, 743 (5th Cir.), cert. denied, 371 U.S. 921, 83 S.Ct. 288, 9 L.Ed.2d 230 (1962); Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310, 312-13 (2d Cir.1958).
 
 
 9
 The implied warranty imposes on a stevedore those obligations that are "inescapable elements of the service undertaken." Ryan, 350 U.S. at 133, 76 S.Ct. at 237. Courts previously have found this warranty to encompass a wide range of duties, including the proper storage of cargo, see Ryan, 350 U.S. at 133, 76 S.Ct. at 237, the duty to "furnish safe equipment pursuant to its contract with the shipowner," see Italia Societa Per Azioni Di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 320, 84 S.Ct. 748, 751, 11 L.Ed.2d 732 (1964), and the duty to deliver goods to the right party, David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 299 (2d Cir.1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 1340, 14 L.Ed.2d 271 (1965). Stein Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287 (2d Cir.1974), extended the warranty to cover the "mysterious disappearance[ ] of cargo in the custody of the stevedore/terminal operator." Id. at 293. "Failure on the part of the stevedore to explain what occurred to the cargo in its control gives rise to a presumption that the stevedore breached this implied warranty." Id. at 290 (footnote omitted). In the instant case, the finding that "the removal of the ingots occurred while the containers were in [Universal's] custody and control" established Universal's liability for breach of its implied warranty.
 
 
 10
 Even if found in breach of the implied warranty, a stevedore can escape liability upon a showing that the carrier's conduct prevents or hinders the stevedore's ability to perform in a workmanlike fashion, see Rodriguez v. Olaf Pedersen's Rederi A/S, 527 F.2d 1282, 1284-86 (2d Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), or where the shipper is " 'best situated to adopt preventive measures.' " Lopez v. Oldendorf, 545 F.2d 836, 839 (2d Cir.1976) (quoting Italia, 376 U.S. at 324, 84 S.Ct. at 754), cert. denied, 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977). However, Universal defends solely on the basis of its alleged nonnegligence, and it is well established that a stevedore can be found in breach of its warranty even in the absence of negligence in discharging its contractual duties. See Italia, 376 U.S. at 321-22, 84 S.Ct. at 752-53; SS Amazonia v. New Jersey Export Marine Carpenters, Inc., 564 F.2d 5, 10 n. 4 (2d Cir.1977); Stein Hall, 494 F.2d at 293; David Crystal, 339 F.2d at 299.[3] Accordingly, on Universal's cross-appeal, we affirm the District Court's imposition of liability for breach of the implied warranty of workmanlike service.
 
 II. COGSA's limitation of liability
 
 11
 The shippers' appeal again requires us to determine the appropriate unit of packaging for purposes of Section 4(5) of COGSA. See 46 U.S.C. Sec. 1304(5) (1988). Section 4(5) concerns the liability of only the carrier or the ship, and COGSA applies after cargo is loaded and before its discharge. See 46 U.S.C. Sec. 1301(e) (1988) (defining "carriage of goods" as covering "the period from the time when the goods are loaded on to the time when they are discharged from the ship"); Miller Export Corp. v. Hellenic Lines, Ltd., 534 F.Supp. 707, 709 (S.D.N.Y.1982). In this case, the bills of lading extended the coverage of Section 4(5) both to the post-discharge period and to Universal as the carriers' stevedore, thereby making COGSA " 'apply [not] of its own force as a statute, but merely as a contractual term in the bill of lading.' " Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 483 (2d Cir.1985) (quoting Colgate Palmolive Co. v. S/S Dart Canada, 724 F.2d 313, 315 (2d Cir.1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984)), cert. denied, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986).
 
 
 12
 The shippers contend that this contractual limitation of a stevedore's liability should be found void as a matter of public policy. Though such an agreement may be invalid as a matter of state law, see, e.g., Colgate Palmolive Co. v. S/S Dart Canada, 724 F.2d 313, 315-16 (2d Cir.1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984), the admiralty warranty of workmanlike performance, rather than state law, governs the indemnity claim against Universal. Admiralty law, which limits liability to $500 per package by statute, certainly permits the contractual extension of COGSA's limitation of liability to cover stevedores and the post-discharge period.
 
 
 13
 A resolution of the shippers' claim presents primarily the question of whether the bill of lading, construed as a contract, reveals the parties' agreement on the appropriate COGSA "package." See Allied Chemical, 775 F.2d at 485. We begin with a bill of lading's use of the term "package," see Allied International American Eagle Trading Corp. v. S.S. Yang Ming, 672 F.2d 1055, 1061 (2d Cir.1982), and will adopt the unit of packaging unambiguously identified in the bill of lading. See Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam, 759 F.2d 1006, 1015-16 (2d Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); Yang Ming, 672 F.2d at 1061. In the event of ambiguity, we look elsewhere in the bill of lading and to other evidence of the parties' intentions. See Allied Chemical, 775 F.2d at 485-86.
 
 
 14
 The bills of lading at issue, as is typically the case, contain two columns that employ the term "package," one of which gives their number and the other of which describes their nature. These columns are headed "NO. OF PKGS." and "DESCRIPTION OF PACKAGES AND GOODS." Thirteen bills of lading, including the three under which the lost ingots were carried, list the figure "600" under the column headed "NO. OF PKGS." Bills of lading nos. 8 and 9 list "300" as the number of packages, and no. 16 lists "596." Under the heading "DESCRIPTION OF PACKAGES AND GOODS" each of the sixteen bills of lading contains the description "ingots: tin ingots." Each bill also contains a separate line or two describing, among other things, the number of "BDLS." (presumably an abbreviation for "bundles"). The thirteen bills that specified 600 as the number of packages and bill of lading no. 16 each indicate 40 "BDLS."; the remaining two bills indicate 20 "BDLS."
 
 
 15
 The number appearing under the heading "NO. OF PKGS." is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as "packages," it is also the ending point of our inquiry. "Package" is a term of art in the ocean shipping business, and parties to bills of lading should expect to be held to the number that appears under a column whose heading so unmistakably refers to the number of packages. That approach, evident in our more recent cases, see Binladen, 759 F.2d at 1015-16; Yang Ming, 672 F.2d at 1061, encourages precision in filling out a key aspect of important documents, and the more consistently it is followed, the more it should minimize disputes.
 
 
 16
 It is possible that whoever filled out the bills of lading intended to leave the "NO. OF PKGS." column blank and endeavored to place in the adjacent column headed "DESCRIPTION OF PACKAGES AND GOODS" the words "600 ingots: tin ingots" as an entire phrase. On this theory, the placement of "600" in the "NO. OF PKGS." column would be an accident of typewriter spacing. However, none of the parties has advanced this theory, and it lacks plausibility. The number "600" is separated by more than one space from the word "ingots," negating any inference that the number was intended to be placed under the "description" heading.
 
 
 17
 In this case, some confusion arose as to the meaning of "600" under the "NO. OF PKGS." column because of the dual significance of that figure. That number coincidentally represents not only the number of individual ingots covered by each of thirteen of the bills of lading, including the three bills for the lost ingots, but also the number of steel-strapped bundles of fifteen ingots each in the entire shipment covered by all sixteen bills. Judge Pollack ruled that the number "600," though appearing under the "NO. OF PKGS." column in each of thirteen bills of lading, refers to the number of bundles in the entire shipment covered by all sixteen bills. That conclusion gave insufficient significance to the number in the "NO. OF PKGS." column and to the separateness of each bill of lading.
 
 
 18
 Where a single shipment is carried under several bills of lading, each bill creates a separate contract to carry discrete portions of the overall shipment, which, in this case, totals 8,996 ingots grouped in 600 steel-strapped bundles. Consistent with this principle, our cases have looked, in determining the unit of packaging to which the "number of packages" figure refers, to the number carried under the bill of lading at issue, not to a number that pertains to the entire shipment. See Binladen, 759 F.2d at 1015-16; Yang Ming, 672 F.2d at 1061. With this understanding in mind, the figure 600, appearing in each of the bills covering the lost ingots, can represent only the number of individual ingots. Moreover, each bill contains a separate tabulation of the number of bundles, demonstrating that the parties meant what they said when they listed a different number under the "NO. OF PKGS." The 40 bundles listed in each of the three bills for the lost ingots equals the number of steel-strapped bundles of 15 ingots into which a shipment of 600 ingots would be organized.
 
 
 19
 Other shipping documents, in particular the other bills of lading, support adherence to the numbers in the "NO. OF PKGS." column. The three bills that disclosed an irregular number in that column (300, 300, and 596) each carried precisely that number of individual ingots. Adding the figures given in that column in all the bills of lading produces the figure 8,996, which corresponds to the number of ingots contained in the entire shipment. Similarly, the bills of lading, taken together, indicate that there are 600 bundles in all, which matches the number of steel-strapped bundles in the shipment as a whole.
 
 
 20
 We therefore agree with the shippers that the numbers in the "NO. OF PKGS." column reflect the parties' understanding as to the number of packages, and we would apply those numbers in determining the aggregate COGSA per-package limitation if the item to which the numbers referred could fairly be considered a "package." However, the numbers reflect the quantity of individual tin ingots, and an ingot is not a COGSA package. By itself, it is "not sufficiently wrapped, bundled, or tied to be [a] COGSA package[ ]," Mitsui & Co. v. American Export Lines, Inc., 636 F.2d 807, 822 (2d Cir.1981). In Mitsui, we declined to consider a stack of 15 ingots to qualify as a "package" in the absence of any indication that the stack was strapped, secured to a pallet, or otherwise subjected to some covering or separation. Though the forming of the metal in the shape of an individual ingot doubtless facilitates handling, that was equally true of the stacks of ingots in Mitsui and is equally unavailing to permit the ingot to be regarded as a "package."
 
 
 21
 If the number reflected in the "NO. of PKGS." column referred to an item or a collection of items that qualified as a COGSA "package," we would readily hold the parties to that number in applying the per-package limitation. Since the number refers to an item that is not a package, we will accept, as the next best indication of the parties' intent, the numbers reflected on the bills of lading that do refer to something that qualifies as a "package," and in this case, that is the number of bundles. We will accept this evidence of the parties' intent, not simply because the number of bundles appeared somewhere on the bills of lading but because the ingots were in fact strapped together in bundles. Thus, we end up affirming the District Court, despite the Court's disregard of the numbers placed in the pertinent column of the bills of lading, because those numbers refer to items that do not qualify as packages and elsewhere the bills reflect the number of bundles into which the ingots were in fact packaged.
 
 
 22
 The judgment of the District Court is affirmed.
 
 
 
 *
 The Honorable Richard Owen of the District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 One of the six hundred bundles contained 11 ingots
 
 
 [2]
 It appears that not all of the carriers asserted an indemnity claim against Universal, but no party has asserted that this affects Universal's liability to the shippers by virtue of the indemnity claims that were asserted
 
 
 [3]
 Some of our earlier cases indicate that a stevedore breaches the warranty of workmanlike performance by acting negligently. See Demsey & Associates, Inc. v. S.S. Sea Star, 461 F.2d 1009, 1017 (2d Cir.1972); Massa v. C.A. Venezuelan Navigacion, 332 F.2d 779, 782 (2d Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186 (1964). These cases either were decided before the Supreme Court's rejection of such an approach in Italia, see Massa, 332 F.2d at 782, or relied on pre-Italia case law, see Demsey, 461 F.2d at 1017 (citing Massa )