**PT. Keraton SELARAS; QQ PT. Citramarga Nusaphala Persada; QQ Konsorsium Hutama Yala; and QQ PT. Citramarga Nusaphala Persada,**

v.

**M/V CARTAGENA DE INDIAS, her engines, machinery, tackle, apparel, etc.; Industrial Maritime Carriers (Bahamas), Inc.; and Flota Mercante Grancolombiana, S.A.**

Civil Action No. 95–7098.

United States District Court,
E.D. Pennsylvania.

April 3, 1997.

Dante Mattioni, Stephen J. Galati, Mattioni, Mattioni & Mattioni, Ltd., Philadelphia, PA, for Plaintiffs.

Alfred J. Kuffler, Palmer, Biezup and Henderson, Philadelphia, PA, for Industrial Maritime Carriers (Bahamas), Inc.

James F. Young, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA. for Flota Mercante Grancolombiana, S.A.

### MEMORANDUM

PADOVA, District Judge.

Plaintiff, an Indonesian importer of construction equipment, hired Defendants, overseas carriers, to transport a mobile truck crane from Philadelphia, Pennsylvania to Jakarta Pusat, Indonesia. The crane sustained damage while in transit, and Plaintiff brought this action pursuant to the Carriage of Goods by Sea Act, 46 U.S.C.A.App. §§ 1300–1315 (West Supp.1997) ("COGSA"). Plaintiff and Defendants submitted cross-motions for partial summary judgment, and, by Memorandum and Order dated October 21, 1996, the Court granted Defendants' Motions and denied Plaintiff's Cross–Motion. *See Pt. Keraton Selaras v. M/V Cartagena De Indias*, No. 95–7098, 1996 WL 596107 (E.D.Pa. Oct.21, 1996). Plaintiff currently submits, for the Court's consideration, a motion to reconsider that decision. For the following reasons, the Court will grant Plaintiff's Motion For Reconsideration and vacate the October 21, 1996 Order.

### I. Facts

Plaintiff, Pt. Keraton Selaras ("Keraton"), imports and operates heavy machinery and construction equipment in Jakarta Pusat, Indonesia. Defendant M/V Cartagena De Indias ("Vessel") is the ship on which the mobile truck crane was transported from the United States to Indonesia. Defendant Flota Mercante Grancolombiana, S.A. ("FMG"), a Columbian company, owns, charters, manages, and operates the Vessel. In making transportation arrangements for the mobile truck crane, Keraton contacted Global Transport Services, Inc. ("Global") to act as its agent and freight forwarder. Global, not a party to this litigation, entered into a contract of carriage with Defendant Industrial Maritime Carriers (Bahamas), Inc. ("IMC") to transport the cargo. IMC chartered the Vessel from FMG. In short, Keraton approached Global to arrange transport; Global contracted with IMC; and IMC chartered the Vessel from FMG. The underlying accident which initiated this lawsuit occurred in Jakarta Pusat. While the Vessel was moored alongside a pier and the "rolling crane house" portion of the mobile truck crane was being unloaded, a wire sling failed, causing the rolling crane house to drop and sustain damage.

Keraton filed suit under the COGSA, which "controls bills of lading that evidence a contract of carriage of goods by sea to or from the United States and in foreign trade." *SPM Corp. v. M/V Ming Moon*, 965 F.2d 1297, 1300 (3d Cir.1992) (citation omitted). Essentially, the COGSA "defines rights, responsibilities, and liabilities of carriers of goods by sea.... [The COGSA aims] to protect shippers from the overreaching of carriers through contracts of adhesion and to provide incentive for careful transport and delivery of cargo." *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.*, 32 F.3d 1244, 1249–51 (8th Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). The Act's application is compulsory. "[O]nce a party issues a bill of lading, goods covered by that bill of lading become subject to section [1304(5) of the COGSA]." *Stolt*

*Tank Containers, Inc. v. Evergreen Marine Corp.*, 962 F.2d 276, 279 (2d Cir.1992). The COGSA contains a liability limitation provision, providing that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... or in the case of goods not shipped in packages, per customary freight unit." 46 U.S.C.A.App. § 1304(5). By contractual agreement, the parties may agree to a higher figure, "either by declaring a higher value on the bill of lading ... or by contractual agreement." *SPM*, 965 F.2d at 1301. *See also* 46 U.S.C.A.App. § 1304(5)' (stating "[b]y agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed").

Defendants moved for partial summary judgment, arguing that Keraton had a fair opportunity to declare a higher value, and, therefore, the COGSA's $500 liability limitation applied. According to Keraton, however, Defendants did not afford Keraton a fair opportunity to declare a higher cargo value. *See Pyropower Corp. v. M/V Alps Maru*, 1993 A.M.C. 1562, 1574, 1993 WL 45978 (E.D.Pa.1993) (stating the "Supreme Court has held that a carrier cannot limit its liability under [the] COGSA unless the shipper is afforded a fair opportunity to declare a higher value and pay a correspondingly higher rate"). The Court agreed with Defendants, finding *prima facie* evidence that they afforded Keraton adequate notice and a fair opportunity. In reaching this decision, the Court examined *inter alia* (1) the Conline Booking Note; (2) the Bill of Lading's "Clause Paramount;" and (3) IMC's Tariff, on file with the Federal Maritime Commission, which explicitly and unambiguously provided Keraton with an opportunity to choose a higher value limitation, informed Keraton of the consequences of the failure to specifically select the higher value limitation, i.e. freezing the value limitation to that contained in the Bill of Lading, and discussed the *ad valorem* rates for excess coverage. The Court also considered Keraton's purchase of insurance; the standardization of bills of lading in the shipping industry; the sophistication of the

parties; and the parties' prior dealings and negotiations.

Having found that the $500 limitation applied, the Court then examined whether the limitation applied *per "package"* or *per customary freight unit*. Keraton asserted that the $500 limitation applied per customary freight unit because the goods were not shipped in packages. Defendants responded that the goods were shipped in packages, and the $500 limit applied per package. The Court agreed with Defendants and awarded partial summary judgment in their favor, limiting recovery to $500 for the one package supposedly damaged. It is that portion of the Court's October 21, 1996 Memorandum and Order that Keraton's current Motion for Reconsideration attacks, and the Court limits its discussion to thereto. Generally, Keraton disputes the Court's conclusion that the rolling crane house is a package under the COGSA.

## II. Standard of Review

■■■ "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985) (citation omitted), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). "Federal district courts should grant such motions sparingly because of their strong interest in finality of judgment." *Continental Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 943 (E.D.Pa. 1995) (citation omitted).

## III. Discussion

### A. The COGSA Generally

The sole issue presented for reconsideration is whether the Court erred in finding that the damaged rolling crane house constituted a package under the COGSA. In this district, *Pyropower Corp. v. M/V Alps Maru*, 1993 A.M.C. 1562, 1993 WL 45978 (E.D.Pa. 1993) provides instruction for defining a package under the COGSA. Adopting legal precepts articulated by the United States Court of Appeals for the Second Circuit, *Pyropower* noted that what constitutes a package is a matter of contract interpreta-

tion. *Pyropower* instructs courts to define package "in light of what the parties intended to describe as the unit of cargo shipped." *Id.* 1993 A.M.C. at 1572. Under *Pyropower,* the Court must examine the bill of lading to determine whether that document codifies the agreements among the parties as to an appropriate package under the COGSA:

For COGSA purposes, the number of packages specified in a 'number of packages' column in a bill of lading generally is controlling. Unless other evidence of the parties' intent plainly contradicts the applicability of the number of packages listed in the 'number of packages' column, or unless the item referred to by that number is incapable of qualifying as a COGSA package, the number appearing in the column constitutes the number of packages.

The Court of Appeals for the Second Circuit also has held that a package is the result of some preparation of the cargo item for transportation which facilitates handling but which does not necessarily conceal or completely enclose the goods. When non-containerized cargo is fully boxed or crated, each crate generally constitutes a package, regardless of the size or weight of the cargo. In addition, materials lashed on skids or pallets may be deemed to be packages. Freestanding cargo, however, not enclosed in a box or a crate, does not constitute goods shipped in a package.

*Id.* at 1572–73 (citations omitted).

## B. Prior Conclusions

In its earlier opinion disposing of Defendants' Motions for Partial Summary Judgment, the Court concluded that the entry contained in the Bill of Lading's "Number of Packages Column" expressed, without contradiction, the parties' intent to ship ten (10) packages. The Court found that the other submissions, i.e., the Packing Specification,

Bills of Lading for other cargo, the Shipper's Export Declaration, etc., did not plainly contradict the expression of the parties' intent regarding quantity as manifested in the Number of Packages column.

The Court also found that irrespective of the expression of the parties' intent regarding the number of packages, extensive packaging preparation transformed the rolling crane house into a package under the COGSA and precluded the possibility that the rolling crane house amounted to nothing more than freestanding cargo. The Court found the record replete with evidence of extensive pre-shipment packaging activity, including (1) the fitting of suitable lifting lugs; (2) the application of markings; (3) the application of a rust inhibitor; and (4) skidding. The Court also noted that the Bill of Lading and Package Specification listed different weights for the cargo in question, suggesting to the Court that additional weight was added through packaging.

In its Motion for Reconsideration, Keraton principally attacks the Court's finding that extensive pre-shipment modifications transformed the rolling crane house from freestanding cargo into a package. According to Keraton, the strong presumption attached to the entries contained in the Number of Packages column only becomes relevant when the cargo qualifies as a COGSA package, which it does not here. The record contains no evidence, argues Keraton, that the rolling crane house became a package as the result of some preparation for transportation that facilitated handling.

Keraton avers that the rust inhibitor is nothing more than a film sprayed on the machinery to prevent rust which does not facilitate handling.[1] Keraton also maintains the record contains no evidence that the rolling crane house was skidded, received special

1. Keraton relies heavily on *Gulf Italia Co. v. American Export Lines, Inc.,* 263 F.2d 135 (2d Cir.) (finding that where a tractor was prepared for shipment by putting waterproof papering over some of its parts, and by partially encasing it with wooden planking, but tread portions were uncovered and it was not attached to a skid, the tractor was not a package), *cert. denied,* 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). *But see Calmaquip Eng'g W. Hemisphere Corp. v. West*

*Coast Carriers Ltd.,* 650 F.2d 633 (5th Cir.1981) (stating a failure to fully enclose 50 pieces of airport loading bridges would not preclude a finding they constituted 50 packages); *Solar Turbines, Inc. v. M/V Alva Maersk,* 584 F.Supp. 32, 33 n. 4 (S.D.N.Y.1983) (remarking that "the reasoning of the court in the *Gulf Italia* case has been 'substantially undercut by later decisions' ") (citations omitted).

handling instructions, or increased in size or weight. The marks placed on the cargo, argues Keraton, are nothing more than inscriptions designed to allow identification. Keraton describes the damaged cargo as "freestanding" and therefore incapable of constituting a packing under the COGSA.

## C. Genuine Issues of Material Fact Exist

■ The Court concludes that it erred in granting partial summary judgment in favor of Defendants in the face of genuine issues of material fact concerning whether the rolling crane house constitutes a package. The Court's prior decision noted the presence of factual inconsistencies, but erroneously ignored them. *See Pt. Keraton Selaras v. M/V Cartagena De Indias,* No. 95–7098, 1996 WL 596107, at *13 (E.D.Pa. Oct.21, 1996) (stating "[t]he Court notes, however, that the record is not without factual inconsistencies.... Irrespective of these inconsistencies, the Court finds that the documents presented by both parties reveal extensive pre-shipment packaging activity").

Despite this earlier conclusion, the Court finds contradicting versions of whether pre-shipment packaging activity occurred. Several submissions support the theory that the rolling crane house was packaged. The Con-line Booking Note states: "[c]argo to be fitted with suitable lifting lugs or other adequate means of lifting and center of gravity to be clearly indicated. Any specially required lifting frames not already on board the vessel shall be supplied by the shipper." (IMC Mem.Supp.Mot.Summ.J.Ex. 3). The original seller of the crane, "MiJack," sent Global a letter instructing that the cargo was to be marked. (*See id.* Ex. 16). A letter from Charlsie Brown, vice president of Global, on Global stationery, corroborates her deposition testimony that the cranes were sprayed with a rust inhibitor prior to loading. (*See id.* Ex. 23). At her deposition, Brown revealed the following activity: the application of a rust inhibitor, skidding, marking, and special handling instructions for the shipment of cranes. (Pl.'s Mem.Opp.Def.'s Mot.Summ.J.Ex. F at 79–80). An organization named "Shipside, Inc.," located in Phila-

delphia, billed Global for "labor, material & equipment to skid one crane ... [and] services to apply rust inhibitor to various pieces of crane, truck, construction equipment." (IMC Mem.Supp.Mot.Summ.J.Ex. 26).

The record also contains measurement discrepancies. On May 20, 1994, the Global Invoice that billed Keraton for shipping the rolling crane house measured the cargo at 1224.56 CBM. The cargo covered under Bills of Lading dated May 26, 1994, however, totals 1,383.33 CBM. (*See id.* Exs. 4, 5, 6, 7). At some point between May 20, 1994 and May 26, 1994, the size of the cargo increased by roughly 158 CBM, from 1224 CBM to 1,383 CBM. Similarly, the Shipper's Export Declaration, dated May 23, 1994, measures the cargo at 349.98 CBM while the Packaging Specification and the Bill of Lading declare a measurement of 399.79 CBM. (*See id.* Ex. 13).

Keraton furnishes contradictory submissions, maintaining that the record contains no Rule 56(c) evidence revealing packaging. Keraton's Motion for Reconsideration contains the affidavit of Delores Cornell, president of the company which disassembled the crane for shipment. Cornell avers that the crane was in no way prepared for transport, specifically stating that the crane was neither "skidded, palletized, wrapped, [nor] in any way packaged or concealed for shipment. The rolling crane house, in particular, was not skidded, placed on pallets, wrapped or in any way packaged for transport. No preparation was done to facilitate handling. The rolling crane house sat on its own treads." (Pl.'s Mem.Supp.Mot.Recons.Ex. 4). James Leonard, the IMC employee who handles vessel operations, testified at his deposition that he was unsure whether the truck crane was wrapped or prepared for transportation in any way and guessed that the only preparation performed involved skidding. (Pl.'s Mem.Opp.Def.'s Mot.Summ.J.Ex. E at 34).

Brown submitted an affidavit in conjunction with Keraton's Motion for Reconsideration ("Brown's Reconsideration Affidavit") in which she states that she arranged for Shipside to spray the machinery with rust protectant, but that the application was not designed to facilitate the handling of the cargo

in any way. According to Brown, only one piece of equipment was skidded, and it was not the damaged rolling crane house. Brown also states that the "marks which are typically placed on goods in ocean transit are for identification purposes only. They do not facilitate handling." (Pl.'s Mem.Supp.Mot.Recons.Ex. 1). The Project Cargo Checker's Tally Sheet from Penn Terminals reveals that "no markings" were made to the rolling crane house. (*Id.* Ex. 2).

The rolling crane house, maintains Keraton, did not increase in size. Upon arrival at Penn Terminals on May 20, 1994, the crane measured 410"l X 150"w X 163"h. The Mate's Receipt states that the rolling crane house contained identical measurements when it was loaded onto the ship. (*See id.* Exs. 2, 3). Brown's Reconsideration Affidavit reveals that when she prepared the Bill of Lading, she initially listed the cubic measure of the rolling crane house at 349.98 CBM. Brown was later advised "by Intermarine that after measurement at the pier, the size of the crane was different than originally stated by MiJack [the original retailer of the crane]. Accordingly, Intermarine changed the [B]ill of [L]ading to represent the actual cubic measure of the crane, 399.79 CBM." (*Id.* Ex. 1). Brown concludes "the increase of the cubic measure of the crane, as listed on the shipping documents, from 349.98 to 399.79, was not because of the addition of packaging material to the rolling crane house." (*Id.*) Brown reaches the same conclusion regarding the increase in the measurement of all cargo listed in the documents from 1224.56 CBM to 1383.33 CBM.

Accordingly, the Court faces a genuine issue of material fact as to whether the damaged rolling crane house constitutes a package for purposes of the COGSA, precluding the possibility of deciding whether the liability limitation applies per package or per customary freight unit. In light of these factual issues, the Court is compelled to grant Keraton's Motion for Reconsideration, vacate the October 21, 1996 Order, and deny the Cross-Motions for Partial Summary Judgment. In reaching this decision, the Court does not disturb its prior interpretation of the parties' intent relating to the *number* of packages as contained in the Number of Packages column. The Court holds only that a genuine issue of material fact exists regarding whether the rolling crane house constitutes a package. The parties understanding with respect to the quantity of cargo damaged—as evidenced in the Number of Packages column— means nothing if the cargo shipped, the rolling crane house, is not a package. *See Seguros Illimani S.A. v. M/V POPI P,* 929 F.2d 89, 95 (2d Cir.1991) (stating "[w]e therefore agree with the shippers that the numbers in the 'NO. OF PKGS' column reflect the parties understanding as to the number of packages, and we would apply those numbers in determining the aggregate COGSA per-package limitation if the item to which the numbers referred to could fairly be considered a 'package' ").[2]

An appropriate Order follows.

### *ORDER*

AND NOW, this 3rd day of April, 1997, upon consideration of Plaintiff's Motion for Reconsideration (Doc. Nos.38, 39, 45), Defendants' Responses thereto (Doc. Nos.41, 42, 46, 47), and an oral argument held on January 2, 1997 (*see* Doc. No. 43), IT IS HEREBY ORDERED THAT:

1. Plaintiff's Motion is **GRANTED.**

2. The Court's Order accompanying *Pt. Keraton Selaras v. M/V Cartagena De Indias,* No. 95–7098, 1996 WL 596107

---

**2.** Keraton also maintains that (1) other evidence in the submissions contradicts the information contained in the Number of Packages column and (2) the rolling crane house is incapable of qualifying as a COGSA package. According to *Pyropower,* these factors dictate the parties' intent concerning the *number* of packages. *See Pyropower,* 1993 A.M.C. at 1572–73 (remarking "[u]nless other evidence of the parties' intent plainly contradicts the applicability of the number of packages listed in the 'number of packages' column, or unless the item referred to by that number is incapable of qualifying as a COGSA package, the number appearing in the column constitutes the number of packages"). The Court's conclusion, however, obviates the need to assess Keraton's arguments. If the rolling crane house does not constitute a package for purposes of the COGSA, then an inquiry into the parties' intent concerning the *number* of packages is of no moment.

(E.D.Pa. Oct.21, 1996) (granting Defendants' Motions for Partial Summary Judgment and denying Plaintiff's Cross–Motion), is **VACATED.**

3. Defendants' Motions for Partial Summary Judgment are **DENIED.** Plaintiff's Cross–Motion for Summary Judgment is **DENIED.**