952 F.2d 636
 1992 A.M.C. 609, 60 USLW 2430
 MONICA TEXTILE CORPORATION, Plaintiff-Appellant,
v.
S.S. TANA, her engines, boilers, etc., Barber West Africa
Lines, Barber Steamship Lines, Inc., Barber
Steamship Lines (N.A.), Inc., and
Sekihyo Line (Panama), S.A.,
Defendants-Appellees.
 No. 360, Docket 91-7635.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 16, 1991.
Decided Dec. 23, 1991.
 
 Peter D. Fenzel, New York City (McDonald, Herbermann & Fenzel, of counsel), for plaintiff-appellant.
 Richard V. Singleton, II, New York City (Todd P. Kenyon, Healy & Baillie, of counsel), for defendants-appellees.
 Before KEARSE, PRATT and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 We are (once again) presented with "the latest skirmish in the age old war between shippers and carriers over their respective rights and liabilities." Matsushita Elec. Corp. v. S.S. Aegis Spirit, 414 F.Supp. 894, 897 (W.D.Wash.1976). This case requires us to revisit the issue whether a massive shipping container is a "package" for purposes of the $500 per-package limitation on liability of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1304(5).
 Holding that the single shipping container was the relevant COGSA package, the district court entered a $500 judgment for the shipper. We now reverse and hold that each of the 76 bales of cloth stowed inside the container is a separate package for COGSA purposes.
 BACKGROUND
 Monica Textile Corporation ("Monica" or the "shipper") engaged the defendants-carriers to transport a single 20-foot shipping container from Africa to Savannah, Georgia. The parties' bill of lading disclosed that the container, which Monica had stuffed and sealed, held 76 bales of cotton cloth. The goods were damaged in transit and Monica brought suit in the District Court for the Southern District of New York (Sand, J.) to recover for the loss.
 
 
 1
 The carriers moved for partial summary judgment limiting their liability to $500 pursuant to COGSA's liability limitation provision, 46 U.S.C.App. § 1304(5). The district court initially denied the motion, holding "that where the bill of lading prepared by the carrier's agent discloses a specific number of identifiable units as the contents of the container, those units [the bales of cloth] constitute the package" for purposes of COGSA's limitation on liability. Monica Textile Corp. v. S.S. Tana, 731 F.Supp. 124, 127 (S.D.N.Y.1990) ["Monica I "].
 
 
 2
 Shortly thereafter, this court decided Seguros "Illimani" S.A. v. M/V Popi P, 929 F.2d 89 (2d Cir.1991), which held that for COGSA purposes the number of packages specified in the "No. of Pkgs." column of the bill of lading is generally controlling. Id. at 94. In the present case, though the "DESCRIPTION OF GOODS" column of the bill of lading stated that the contents of the container consisted of 76 bales of cotton cloth, the "No. of Pkgs." column of the bill of lading had the number "1" typed in, and a line labeled "Total Number of Packages or Units in Words (Total Column 19 [No. of Pkgs. column]," had the word "ONE" typed in. In light of these facts, Judge Sand permitted the carriers to renew their summary judgment motion to limit their liability to $500, and the district court reversed itself, holding that our intervening decision in Seguros compelled a finding that the single container, rather than the 76 bales stowed therein, was the relevant COGSA package. See Monica Textile Corp. v. S.S. Tana, 765 F.Supp. 1194, 1195-96 (S.D.N.Y.1991) ["Monica II "]. Because the carriers conceded liability, the district court entered judgment for Monica in the amount of $500.
 
 
 3
 Monica appeals the judgment of the district court, maintaining that the 76 individual bales of cloth, not the solitary shipping container, were the appropriate COGSA packages. We agree and therefore reverse the judgment of the district court.
 
 DISCUSSION
 
 4
 The district court reversed itself in Monica II on the basis of Seguros, which it read
 
 
 5
 as establishing a bright-line rule for determining the number of COGSA packages from the bill of lading. The number of packages is the number appearing in the "No. of Pkgs." column of the bill, unless other evidence of the parties' intent plainly contradicts the applicability of that number, or unless the item referred to by that number is incapable of qualifying as a COGSA package.
 
 
 6
 Monica II, 765 F.Supp. at 1195-96. The district court's characterization of the Seguros rule is accurate, as far as it goes. Seguros, however, involved 600 separate steel-strapped bundles, each containing 15 tin ingots. The issue therefore was whether there were 600 "packages" or 9,000 (600 X 15) "packages". Most significantly, our Seguros decision did not purport to apply to containers, and the district court's application of the Seguros rule to the container context was erroneous. An understanding of the "container" cases is necessary to appreciate our present holding that Seguros should not be extended to containers.
 
 The Container Cases
 
 7
 Long before COGSA was enacted, industrialized nations recognized the need to reconcile the desire of carriers to limit their potential liability with their vastly superior bargaining power over shippers. See H.R.Rep. No. 2218, 74th Cong., 2d Sess. 6-9 (1936); Mitsui & Co. v. America Export Lines, Inc., 636 F.2d 807, 814-15 (2d Cir.1981); Comment, Containerization, the Per Package Limitation, and the Concept of "Fair Opportunity," 11 Mar.Law. 123, 124 (1986). The nations at the Brussels Convention of 1924 balanced these competing concerns with a per-package limitation on liability. See International Convention for the Unification of Certain Rules Relating to Bills of Lading, Aug. 25, 1924, 51 Stat. 233, 120 L.N.T.S. 155 (1931-32), reprinted in A. Knauth, The American Law of Ocean Bills of Lading 37-72 (4th ed. 1953); Note, Defining "Package" in the Carriage of Goods by Sea Act, 60 Tex.L.Rev. 961, 964-66 (1982). The principles established by the Brussels Convention became the template for COGSA. See Robert C. Herd & Co. v. Krawill Mach. Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959) ("[t]he legislative history of the Act shows that it was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924").
 
 
 8
 Unhappily, neither the statute nor its legislative history provides any clue as to the meaning of "package" in the Act. See Aluminios Pozuelo Ltd. v. S.S. Navigator, 407 F.2d 152, 154 (2d Cir.1968). Despite the difficulties this lack of guidance engendered,[1] courts managed to muddle through this oft-litigated issue by generally deferring to the intent of the contracting parties when that intent was both clear and reasonable. This intent-approach later became strained by technological advances in the shipping industry. Indeed, "[f]ew, if any, in 1936 could have foreseen the change in the optimum size of shipping units...." Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943, 945 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).
 
 
 9
 We first addressed COGSA's application to shipping innovations in Standard Electrica, which required us to determine which was the relevant COGSA package: each 60-pound carton or the pallets on which the cartons were bound together. Divining the parties' intent, we held the pallet to be the relevant COGSA package. See id. at 946.
 
 
 10
 The so-called "container revolution", however, "added a new dimension to the problem." Mitsui, 636 F.2d at 816. See generally Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 J.Mar.L. & Com. 203 (1970). Shippers, carriers and industry commentators "speculated at the time whether the courts would adopt the analysis of Standard Electrica or fashion a new rule to apply to containers." Note, The Shipping Container as a COGSA Package: The Functional Economics Test is Abandoned, 6 Mar.Law. 336, 340 n. 16 (1981) (collecting citations). Our decision in Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir.1971) (Friendly, C.J.), settled the issue, distinguishing Standard Electrica and veering away from our pre-container cases because of our
 
 
 11
 belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that "package" is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained."
 
 
 12
 Id. at 815 (footnote omitted). Leather's Best thus stood foursquare for the proposition " 'that a container rarely should be treated as a package.' " Smythgreyhound v. M/V "Eurygenes", 666 F.2d 746, 748 n. 5 (2d Cir.1981) (quoting Croft & Scully Co. v. M/V Skulptor Vuchetich, 508 F.Supp. 670, 678 (S.D.Tex.1981), aff'd in relevant part, 664 F.2d 1277 (5th Cir.1982)).
 
 
 13
 Although other courts subsequently embraced Leather's Best, see, e.g., Matsushita Elec. Corp. v. S.S. Aegis Spirit, 414 F.Supp. 894, 907 (W.D.Wash.1976), cited with approval in Mitsui, 636 F.2d at 819-20, we began to stray from it, in favor of a so-called "functional economics test." Whereas Leather's Best held that treating a container as a COGSA package is inconsistent with congressional intent and therefore strongly disfavored, see Leather's Best, 451 F.2d at 815; accord Mitsui, 636 F.2d at 820-21, the functional economics approach ignored congressional intent in favor of a "law and economics" analysis. See, e.g., Royal Typewriter Co. v. M/V Kulmerland, 483 F.2d 645, 648-49 (2d Cir.1973) (container is presumptively the package where the units inside are not suitable for breakbulk shipment); Cameco, Inc. v. S.S. American Legion, 514 F.2d 1291, 1298-99 (2d Cir.1974).
 
 
 14
 The reaction to our functional economics approach was swift and overwhelmingly negative, as courts and commentators roundly criticized us for it. See Croft & Scully Co. v. M/V Skulptor Vuchetich, 664 F.2d 1277, 1281 n. 10 (5th Cir.1982) (functional economics test "necessitated much judicial guessing work, and we are well rid of it"); Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A., 646 F.2d 169, 172 (5th Cir. Unit B May 1981) (test "was subject to severe criticism from all corners"); Matsushita, 414 F.Supp. at 906 (rejecting the test "as contrary to the statute, commercially impracticable and unwise"); DeOrchis, The Container and the Package Limitation--The Search for Predictability, 5 J.Mar.L. & Com. 251, 257 (1974); Simon, The Law of Shipping Containers (pt. 1), 5 J.Mar.L. & Com. 507, 522 (1974).
 
 
 15
 Recognizing that the functional economics test was "basically inconsistent with the holding of Leather's Best," and acknowledging the criticism the new approach had drawn, we eventually abandoned it. See Mitsui, 636 F.2d at 818-21. Judge Friendly, who had earlier written Leather's Best, also authored the Mitsui decision, and circulated it to the entire court. Mitsui held that when a bill of lading discloses on its face what is inside the container, and those contents may reasonably be considered COGSA packages, then the container is not the COGSA package. See id.; Smythgreyhound, 666 F.2d at 753. Mitsui settled the law in container cases for this Circuit and has been steadfastly followed. See, e.g., Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam", 759 F.2d 1006, 1013 (2d Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); Smythgreyhound, 666 F.2d at 753. Mitsui and its progeny, moreover, have been followed by courts in other circuits; see 2A E. Flynn & G. Raduazzo, Benedict on Admiralty § 167, at 16-34 (7th ed. 1991) ("the Mitsui- Binladen approach seems to be gaining favor in the rest of the country"); see, e.g., Hayes-Leger Assocs., Inc. v. M/V Oriental Knight, 765 F.2d 1076, 1080 (11th Cir.1985); Allstate Ins., 646 F.2d at 172; International Adjusters, Inc. v. Korean Wonis-Son, 682 F.Supp. 383, 385-86 (N.D.Ill.1988); and it has been praised by courts and commentators. See, e.g., Allstate Ins., 646 F.2d at 172 & n. 1 ("we believe that the rule developed in Mitsui and Leather's Best is the best judicial solution, in the absence of a legislative solution"); 2A E. Flynn & G. Raduazzo, Benedict on Admiralty § 167, at 16-34 (7th ed. 1991) ("[a]mong other benefits, the Mitsui- Binladen approach is consistent with the position of the international community"); Note, The Shipping Container as a COGSA Package: The Functional Economics Test is Abandoned, 6 Mar.Law. 336, 345 (1981) ("In terms of predictability and judicial economy, the decision in Mitsui is a realistic approach in an area in desperate need of legislative reform.").
 
 
 16
 Although Mitsui was concerned with containers, a district court later extended it to pallets. See Allied Int'l Am. Eagle Trading Corp. v. S.S. "Yang Ming", 519 F.Supp. 187, 190 (S.D.N.Y.1981), rev'd, 672 F.2d 1055 (2d Cir.1982). We reversed, holding that containers and pallets are quite different and that "Standard Electrica ... is still the law with regard to pallets." Yang Ming, 672 F.2d at 1061. In so doing, we methodically documented why our decisions in Standard Electrica and Leather's Best required distinct analyses for container and non-container cases. See id. at 1058-61. We explained:
 
 
 17
 [T]he container cases involve factors not found in pallet cases. Because of their size and their function in the shipping industry, containers are ordinarily not considered "packages."
 
 
 18
 ....
 
 
 19
 ... In Mitsui ... as in other container cases, the courts must look askance at an agreement which purports to define a container as a "package" because the results of such a limitation can be ludicrous.
 
 
 20
 Id. at 1061, 1062.
 
 
 21
 We thus rejected any notion that container and non-container cases were interchangeable; they were then and remain now separate lines of authority. They had been uniformly so construed until the present case. See, e.g., St. Paul Fire & Marine Ins. Co. v. Sea-Land Serv., Inc., 735 F.Supp. 129, 133 (S.D.N.Y.1990) ("containers present different considerations than pallets"); E. Flynn & G. Raduazzo, Benedict on Admiralty § 167, at 16-28 (7th ed. 1991) ("These standards [for determining the relevant COGSA package] vary according to whether or not the cargo is shipped in a container, and the discussion here will therefore treat non-containerized and containerized shipments separately.").
 
 
 22
 Seguros "Illimani"
 
 
 23
 We now turn to Monica II's application of our Seguros decision. The dispute in Seguros was whether each bundle of 15 tin ingots, or each individual ingot, constituted the relevant COGSA package. See Seguros "Illimani" S.A. v. M/V Popi P, 929 F.2d 89, 92 (2d Cir.1991). We therefore adopted the following test to settle such controversies:
 
 
 24
 The number appearing under the heading "NO. OF PKGS." is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as "packages," it is also the ending point of our inquiry. "Package" is a term of art in the ocean shipping business, and parties to bills of lading should expect to be held to the number that appears under a column whose heading so unmistakably refers to the number of packages.
 
 
 25
 Seguros, 929 F.2d at 94.[2] As between bales, boxes, bundles, cartons, cases, crates and other COGSA packages, the Seguros rule is as sensible as it is straightforward. But all "packages" were not created equal, as our container cases make plain. Containers raise unique issues which we have addressed in a distinct line of case law.
 
 
 26
 In light of our significant container jurisprudence, the Seguros rule is inapposite in the container context. In Seguros, the parties disputed whether the ingots or the bundles containing the ingots should be considered the relevant COGSA packages. No one even questioned the district court's holding that "[i]t is clear that the container is not the appropriate 'package' in this case." Seguros "Illimani" S.A. v. M/V Popi P, 735 F.Supp. 108, 111 (S.D.N.Y.1990), aff'd, 929 F.2d 89 (2d Cir.1991). Viewed in context, then, Seguros simply does not purport to apply when a container is alleged to be the relevant COGSA package. Indeed, that Seguros would, in dictum, overrule sub silentio a long line of Second Circuit precedent is inconceivable. Notwithstanding the insertion in the number-of-packages column(s) of the bill of lading of a number reflecting the number of containers, where the bill of lading discloses on its face what is inside the container(s) and those contents may reasonably be considered COGSA packages, the latter, not the container(s), are the COGSA packages. The district court's holding to the contrary in Monica II is erroneous.
 
 Parties' Intent and Bill of Lading
 
 27
 We next consider the carriers' argument that the bill of lading manifests the parties' agreement that the container is the relevant COGSA package.
 
 
 28
 In non-container cases we have generally deferred to the parties' intent, as manifested by their bill of lading, in determining what unit is the relevant COGSA package. See, e.g., Seguros, 929 F.2d at 95; Standard Electrica, 375 F.2d at 946. Such deference to the parties' wishes permits commercial flexibility without offending the statute.
 
 
 29
 COGSA, however, requires that we view container cases through a different prism. Thus, in container cases we must " 'take a critical look' " at clauses purporting to define the container as the COGSA package, Smythgreyhound, 666 F.2d at 750 (quoting Mitsui, 636 F.2d at 815). Accordingly, we have consistently cast a jaundiced eye upon language purporting to embody such an agreement.
 
 
 30
 The reason for this skepticism is that such agreements run against the grain of COGSA. See id.; Binladen, 759 F.2d at 1012-13 ("classification of [the container] as a 'package' would violate the purpose of § 4(5) by permitting the carrier to limit its liability unduly"); Yang Ming, 672 F.2d at 1062 ("the courts must look askance at an agreement which purports to define a container as a 'package' "); Mitsui, 636 F.2d at 817 (Leather's Best "acknowledg[ed] that treating the containers as packages ... was precluded by the underlying purpose of [COGSA] § 4(5)"). Thus, "our repeatedly-expressed reluctance for sound reasons to treat a container as a package", Binladen, 759 F.2d at 1015, compels us to scrutinize the carriers' claim that they agreed with Monica to treat the container as the COGSA package.
 
 
 31
 The bill of lading in this case discloses on its face that 76 bales of cloth were stowed in the container. Even though that disclosure triggers Mitsui's presumption that the container is not the COGSA package, see Mitsui, 636 F.2d at 821; see also Smythgreyhound, 666 F.2d at 752 ("[Mitsui ] adopted a general rule that where the bill of lading discloses the contents of the container, then the container is not the COGSA package.") (brackets in original), the carriers maintain that the bill of lading nevertheless discloses an agreement with Monica that the single container was the relevant package.
 
 
 32
 They emphasize two clauses appearing on the reverse of the carriers' standard bill of lading forms.[3] Clause 2 of the bill of lading provides, in relevant part:
 
 
 33
 The word "package" shall include each container where the container is stuffed and sealed by the Merchant or on his behalf, although the Shipper may have furnished in the Particulars herein the contents of such sealed container. (See Clause 11).
 
 Clause 11 states:
 
 34
 Neither the Carrier nor the vessel shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding U.S. $500 per package.... Where container(s) is stuffed by Shipper or on his behalf, and the container is sealed, the Carrier's liability will be limited to U.S. $500 with respect to the contents of each container, except when the Shipper declares value on the face hereof (Box 26) and pays additional charges on such declared value (Box 23). The freight charged on sealed containers when no higher valuation is declared by the Shipper is based on a value of U.S. $500 per container.
 
 
 35
 The carriers maintain that these clauses articulate an agreement between them and Monica to treat the container as the package.
 
 
 36
 The carriers' argument is premised on dicta in our container cases suggesting that parties to a bill of lading have the right to agree to treat a container as the relevant COGSA package. For example, in Smythgreyhound, we remarked in a footnote that parties may
 
 
 37
 agree between themselves that the container will be the COGSA "package," especially in cases where COGSA does not apply ex proprio vigore.... [W]e hold today that in the absence of clear and unambiguous language indicating agreement on the definition of "package," then we will conclusively presume that the container is not the package where the bill of lading discloses the container's contents.
 
 
 38
 Smythgreyhound, 666 F.2d at 753 n. 20 (emphasis in original). Thus, the otherwise "clear rule that where the contents of the container are disclosed in the bill of lading then the container is not the COGSA package", id. at 753, seemingly has an exception: we will treat the container as the "package" if the bill of lading discloses that the parties have so agreed in terms that are explicit and unequivocal.
 
 
 39
 This supposed exception to the Mitsui rule, however, is more apparent than real. No appellate precedent has been found applying this exception to a bill of lading like the one before us now. And for good reason: our container cases recognize that when a bill of lading refers to both containers and other units susceptible of being COGSA packages, it is inherently ambiguous. In Smythgreyhound, we candidly admitted "that no shipper ever actually intends that its recovery will be limited to $500 per container, or that any carrier, in the absence of an express agreement, intends that the recovery should exceed $500 per container." Smythgreyhound, 666 F.2d at 748 n. 4; see also id. at 751 ("on their face the bills of lading reflect the lack of agreement, insofar as they refer to both 'containers' and 'cartons' "); Matsushita, 414 F.Supp. at 906 ("it is clear that there was not and, realistically, could not have been any mutual understanding between [the shipper and carrier] with respect to the COGSA package"). Mitsui and its progeny resolve this ambiguity against the carriers. See Mitsui, 636 F.2d at 822-23.
 
 
 40
 It is not without significance that the two boilerplate clauses upon which the carriers rely have consistently failed to persuade us in the past that the container is intended to be the package. Clause 11, for example, is essentially the same one we ignored in Leather's Best, even though in Leather's Best the clause appeared on the front of the bill of lading in capital letters:
 
 
 41
 SHIPPER HEREBY AGREES THAT CARRIER'S LIABILITY IS LIMITED TO $500 WITH RESPECT TO THE ENTIRE CONTENTS OF EACH CONTAINER EXCEPT WHEN SHIPPER DECLARES A HIGHER VALUATION AND SHALL HAVE PAID ADDITIONAL FREIGHT ON SUCH DECLARED VALUATION PURSUANT TO APPROPRIATE RULE IN THE CONTINENTAL NORTH ATLANTIC WESTBOUND FREIGHT CONFERENCE TARIFF.
 
 
 42
 Leather's Best, 451 F.2d at 804. Compare Monica I, 731 F.Supp. at 126 (similar clause "in miniscule [sic] type face" on reverse of bill of lading).
 
 
 43
 Similarly, Clause 2 is virtually indistinguishable from one rejected in Matsushita which provided:
 
 
 44
 where the cargo has been either packed into container(s) or unitized into similar article(s) of transport by or on behalf of the Merchant, it is expressly agreed that the number of such container(s) or similar article(s) of transport shown on the face hereof shall be considered as the number of the package(s) or unit(s) for the purpose of the application of the limitation of liability provided for herein.
 
 
 45
 Matsushita, 414 F.Supp. at 899;[4] see also St. Paul Fire & Marine Ins., 735 F.Supp. at 132 ("Allowing the carrier ... to insert an essentially unbargained-for definition of 'package' in the bill of lading would effectively eliminate the protection COGSA was meant to afford shippers."); Monica I, 731 F.Supp. at 127 (Mitsui and its progeny "control[ ] despite the language of clause 11").
 
 
 46
 Because the bill of lading in this case is ambiguous on its face and Clauses 2 and 11 are unbargained-for boilerplate, we cannot say that Monica and the carriers unequivocally agreed to treat the container as the COGSA package. Thus, the exception to Mitsui 's rule is not applicable; and the 76 bales, not the container, are the relevant units for determining the extent of the carriers' liability under the statute.
 
 
 47
 This conclusion is consistent with our longstanding recognition of what every shipper knows: that "bills of lading are contracts of adhesion ambiguities in which must be resolved against the carrier...." Mitsui, 636 F.2d at 822-23. Clauses 2 and 11, like others printed on the back of a form bill of lading, "carr[y] little weight toward establishing intent, being [ ] unilateral, self-serving declaration[s] by the carrier which w[ere] not negotiated by the parties and could scarcely be discerned by the unaided eye in the maze of microscopic and virtually illegible provisions on the back[ ] of the bill[ ] of lading." Matsushita, 414 F.Supp. at 906 n. 52; see also St. Paul Fire & Marine Ins. Co. v. Sea-Land Serv., Inc., 735 F.Supp. 129, 132 & n. 4 (S.D.N.Y.1990).
 
 CONCLUSION
 
 48
 Seguros provides a bright-line rule in non-container cases that, "the more consistently it is followed, the more it should minimize disputes." Seguros, 929 F.2d at 94. Similarly, Mitsui and its progeny continue to provide a simple rule in container cases, a rule that is easily administered by the courts and readily amenable to ex ante application by contracting parties. Together, these rules foster predictability in this nettlesome area of the law. Applied faithfully and consistently, they should assist carriers, shippers and the courts to "avoid the pains of litigation." Standard Electrica, 375 F.2d at 945.
 
 
 49
 Monica I correctly construed and applied our container jurisprudence; Monica II did not. Accordingly, the judgment of the district court in Monica II is reversed.
 
 
 
 [1]
 Compare, e.g., Hartford Fire Ins. Co. v. Pacific Far East Line, Inc., 491 F.2d 960, 965 (9th Cir.) (holding that 18-ton electrical transformer bolted to a skid was not a COGSA package), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974) with Aluminios Pozuelo Ltd. v. S.S. Navigator, 407 F.2d 152, 155 (2d Cir.1968) (holding that a 3-ton toggle press bolted to a skid was a COGSA package). See generally id. at 154-56 (discussing pre-container cases)
 
 
 [2]
 Compare Smythgreyhound, 666 F.2d at 748 n. 4 & 751 ("on their face the bills of lading reflect the lack of agreement, insofar as they refer to both 'containers' and 'cartons' ") and Matsushita, 414 F.Supp. at 906 (no mutual understanding with respect to what constitutes COGSA package where carrier and shipper had no direct or indirect dealings). Other container cases have accorded little or no weight to the number in the "number of packages" column. See, e.g., Binladen, 759 F.2d at 1009 & 1016 n. 11; Leather's Best, 451 F.2d at 804
 
 
 [3]
 The district court was generous in its characterization of the typeface on the reverse of the bill of lading as "miniscule [sic]." Monica I, 731 F.Supp. at 126. Whereas standard typeface (like the body of this opinion) has six lines per inch, the carriers' boilerplate has sixteen lines per inch
 
 
 [4]
 Judge Friendly praised Matsushita and adopted its reasoning in Mitsui. See 636 F.2d at 819-21 (quoting Judge Beeks' "outstanding" Matsushita opinion); see also Smythgreyhound, 666 F.2d at 750 n. 11 (quoting Matsushita and repeating Mitsui 's reference to Judge Beeks as " 'an experienced admiralty lawyer before his appointment to the bench' ")