SIACI SAINT HONORE a/s/o Lvmh Fragrance Brands and Ideal Logistics, Plaintiff,

v.

IRONBOUND EXPRESS, INC. and Danmar Lines Ltd., Defendants.

No. 12 CV. 0833(VM).

United States District Court, S.D. New York.

Aug. 6, 2012.

McElduff, James William Carbin, Duane Morris, LLP, Newark, NJ, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Siaci Saint Honore ("Siaci") brings this action as subrogee of LVMH Fragrance Brands ("LVMH") and Ideal Logistics ("Ideal," together with LVMH, "the Insured") against defendants Ironbound Express, Inc. ("Ironbound") and Danmar Lines Ltd. ("Danmar," together with Ironbound, "Defendants") to recover $122,848.10 arising from the loss of the Insured's cargo. By separate letters dated June 13, 2012 (Docket Nos. 20, 21), Defendants indicated their intent to move to dismiss Siaci's complaint (the "Complaint") based on the statute of limitations and a forum selection clause. Siaci replied by letter ("Reply") (Docket No. 24) dated June 26, 2012. Having reviewed the parties' submissions, the Court deems Defendants' June 13, 2012 letters as constituting motions to dismiss the Complaint. For the reasons discussed below, Defendants' motions to dismiss (the "Motions") are GRANTED, and the Complaint is DISMISSED.

## I. BACKGROUND[1]

### A. THE UNDERLYING SHIPPING TRANSACTION

This action arises out of an international shipment of goods from St. Quentin,

James Paul Krauzlis, Badiak & Will, LLP, Mineola, NY, for Plaintiff.

James A. Wesoce, Rawle & Henderson, LLP, Philadelphia, PA, Patrick Ryan

1. The Court derives the factual and procedural summary below from: (1) Pl. Siaci's Compl. Against Defs. Danmar and Ironbound (Docket No. 1); (2) Def. Danmar's Answer to Pl. Siaci's Compl. With Affirmative Defenses and Cross-cl. Against Def. Ironbound (Docket No. 5); (3) Def. Ironbound's Answer to Pl. Siaci's Compl. With Affirmative Defenses and Cross-cl. Against Def. Danmar (Docket No. 13); (4) Endorsed Letter from Def. Danmar to the Court With Arguments for Dismissal of Pl. Siaci's Compl. ("Danmar's Motion") (Docket No. 20); (5) Danmar Express Sea Waybill for Combined Transport or Port–to–Port Shipment, Attached to Danmar's Motion (Docket No. 20); (6) Danmar Bill of Lading Conditions of Carriage, Attached to Danmar's Motion (Docket No. 20); (7) Endorsed Letter from Def. Ironbound to the Court With Arguments for Dismissal of Pl. Siaci's Compl.

France to Dayton, New Jersey, via the ports of Le Havre, France and New York. The Insured contracted with Danmar to transport 1320 packages of perfumes and cosmetics in an ocean shipping container between France and New York and then in an on-land carrier between New York and New Jersey. Danmar subsequently subcontracted with Ironbound to transport the goods in a motor carrier between New York and New Jersey.

To set forth its obligations under the shipping agreement and to provide evidence of the agreement's terms, Danmar issued to the Insured an Express Sea Waybill (the "Bill"). The Bill is an intermodal, "through" bill of lading, which incorporates both the ocean and inland portions of the transport into a single document and extends the Bill's provisions to any subcontracts, such as Danmar's subcontract with Ironbound.

According to Siaci, the goods were stolen while in the custody and control of Defendants during the inland portion of the shipment. Delivery should have taken place on January 17, 2011. The Insured learned of the loss on January 21, 2011, and shortly afterward received money for the value of the goods from Siaci, from whom the Insured had previously purchased a marine insurance policy. On February 2, 2012, Siaci filed suit against Defendants to recover the money disbursed to the Insured, claiming that the Defendants breached their obligations under the Bill.[2]

---

("Ironbound's Motion") (Docket No. 21); (8) Endorsed Letter from Pl. Siaci to the Court With Arguments Replying to Danmar's Motion and Ironbound's Motion ("Reply") (Docket No. 24). Except where specifically referenced, no further citation to these sources will be made.

2. Danmar subsequently filed a third-party complaint ("the Third–Party Complaint") against container shippers Hapag–Lloyd Ak-

## B. *RELEVANT PROVISIONS OF THE BILL OF LADING*

Multiple provisions of the Bill are pertinent to the Court's analysis of the Motions. The relevant provisions fall into two groups: (1) clauses establishing procedural limits to claims brought against Danmar and its subcontractors for loss or damage of cargo; and (2) clauses identifying the laws—statutes and the case law interpreting those statutes—that govern the enforceability of the Bill's terms.

The first group includes the time bar clause ("Time Bar Clause") and the forum selection clause ("Forum Selection Clause"). The Time Bar Clause provides that "... the Carrier [i.e., Danmar or its subcontractor] shall be discharged of all liability under this Bill ... unless suit is brought within one year after the delivery of the Goods or the date when the Goods should have been delivered." (Docket No. 20). The "Law and Jurisdiction Clause," which subsumes the Forum Selection Clause, provides that any litigation arising under or related to the Bill shall "be determined exclusively by the competent courts of Basel–Stadt, Switzerland, and by no other court." (*Id.*).

The second group of clauses, defining the legal standards that determine the validity of certain terms in the Bill, includes the Amount of Compensation Clause ("Compensation Clause") and the Para-

tiengesellschaft, Hamburg ("Hapag–Lloyd") and Hapag–Lloyd (America), Inc. ("Hapag America," together with Hapag–Lloyd, the "Third–Party Defendants") for indemnity. (*See* Docket No. 9). Danmar and Ironbound then filed cross-claims against one another. (*See* Docket Nos. 5, 13). Finally, the Third–Party Defendants jointly counterclaimed against Ironbound for indemnity. (*See* Docket No. 16).

mount Clause ("Paramount Clause"). The Compensation Clause distinguishes between the law that would apply to loss or damage occurring at sea and loss or damage not occurring at sea.

Where the loss or damage did not occur at sea, § 13.2(B) of the Compensation Clause ("§ 13.2(B)") provides:

the liability of the Carrier shall be determined by the provisions contained in any international convention or national law which cannot be departed from by private contract to the detriment of the Merchant,[3] and would have applied if the Merchant had made a separate and direct contract with the Carrier in respect of the particular stage of carriage where the loss or damage occurred and had received as evidence thereof any particular document which must be issued in order to make such international convention or national law applicable.

(*Id.*). Section 13.2(B)(b) of the Compensation Clause

("§ 13.2(B)(b)") expounds on the terms of Danmar's liability for non-sea carriage by specifically addressing its responsibilities during transportation in the United States from the port of discharge. This clause provides that the obligations of the carrier during such transportation "shall be subject to the inland carrier's contracts of carriage and tariffs and any law compulsorily applicable as well as subject to any liability limitations contained in said inland carrier's contracts." (*Id.*).

Where the loss or damage happened during carriage at sea, § 13.2(C) of the Compensation Clause ("§ 13.2(C)") states that the carrier's liability for the alleged breach of duty is defined by a separate clause known as the "Paramount Clause," which provides:

where the contract evidenced by this Bill of Lading is governed by the Carriage of Goods by Sea Act of the United States ... then provisions stated in the acts shall apply, respectively ... for the time the Goods are in the possession of the Carrier or its subcontractors, including the time following receipt prior to loading and following discharge prior to delivery....

(*Id.*).

## II. *DISCUSSION*

The Court's analysis of Defendants' Motions turns on a dispute of contractual interpretation. The parties disagree about what body of law governs certain terms of the Bill and about the validity of two particular provisions, namely, the Forum Selection Clause and the Time Bar Clause. Specifically, the issues before the Court are: (1) whether the Carmack Amendment to the Interstate Commerce Act of 1887 ("Carmack"), 49 U.S.C. § 14706, *et seq.*, or the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701, controls the Time Bar and Forum Selection Clauses, given that the loss of the Insured's cargo allegedly occurred on land; and (2) if COGSA controls, whether the Court should honor the Forum Selection Clause and/or Time Bar Clause in light of relevant provisions of COGSA.

Siaci argues that in drafting the Bill, the parties agreed that determinations of liability for loss of cargo would be subject to Carmack, which preempts both the Forum Selection and Time Bar Clauses. Defendants contend that COGSA governs both the inland and overseas portions of travel covered by the Bill, and that, under COGSA, the Forum Selection Clause and Time Bar Clause are presumptively enforceable.

---

**3.** "The Merchant" refers to the shippers of the cargo, which in this case are the Insured.

## A. THE GOVERNING LAW

### 1. The Carmack Amendment

Carmack governs the terms of bills of lading issued by rail and motor carriers operating within the United States. *Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.*, —— U.S. ——, 130 S.Ct. 2433, 2440–41, 177 L.Ed.2d 424 (2010); *Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 145 (2d Cir.2010). The statute may pertain to the case before the Court for two reasons. First, Carmack prohibits a contractually negotiated "period of less than 2 years for bringing a civil action against" a carrier. 49 U.S.C. § 14706(e)(1). Second, a plaintiff suing a carrier under Carmack faces constraints as to venue: he must bring his claim in a federal district court or state court in the United States. *Id.* § 14706(d).

In the statutory text, Carmack specifies a category of bills of lading that fall within its scope. *Id.* § 14706(a)(1) ("§ 14706(a)(1)"). Liability under a bill of lading is imposed on the carrier pursuant to Carmack's provisions if

> actual loss or injury to the [shipper's] property [is] caused by: (A) the receiving carrier, (B) the delivering carrier, or, (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading. . . .

*Id.; see also* 49 U.S.C. § 11706(a) ("§ 11706(a)") (using nearly identical language to describe category of rail carriers subject to Carmack liability).

In *Regal–Beloit*, the Supreme Court of the United States closely examined § 11706(a)—a provision of Carmack laying out the criteria for the rail carriers under the statute's jurisdiction. *See* 130 S.Ct. at 2444. The Supreme Court found that Congress intended that Carmack control only the terms of bills issued by rail carriers which fit the description in § 11706(a). *Id.* According to the Supreme Court, a carrier is included in the category defined by § 11706(a) if it qualifies as a "receiving carrier." *Id.* at 2443; *see also Royal & Sun*, 612 F.3d at 144 (extending *Regal–Beloit*'s interpretations of § 11706(a) to § 14706(a)(1), equivalent provision in Carmack for motor carriers).

A "receiving rail carrier" is the initial carrier in the shipment that "receives" the property for domestic transportation at the journey's point of origin. *Regal–Beloit*, 130 S.Ct. at 2443–44. Thus, the carrier must transport the goods in the United States, and its carriage must chronologically precede transportation by all other carriers whose obligations are incorporated into the same bill of lading. Under this two-part analysis, "ascertaining the shipment's point of origin is critical to deciding whether the shipment includes a receiving rail carrier." *Hartford Fire Ins. Co. v. Expeditors Int'l of Wash., Inc.*, No. 10 Civ. 5643, 2012 WL 2861433, *5 (S.D.N.Y. July 9, 2012) (*quoting Regal–Beloit*, 130 S.Ct. at 2443).

■ Because only "receiving carriers" can be bound by Carmack, the statute cannot "apply to [any] shipment originating overseas under a single through bill of lading." *Regal–Beloit*, 130 S.Ct. at 2435–36. In a transaction of this structure, neither carrier constitutes a "receiving carrier." While the overseas carrier is the initial carrier, it does not transport goods domestically; likewise, any subsequent carrier—whether inland or maritime—may indeed receive cargo for transport within the United States, but its journey temporally follows another carrier under the same through bill. An inland carrier can therefore fall under Carmack's jurisdiction only if it obtains the goods under its own,

separate bill of lading or if it begins the shipment. As the Supreme Court explained, "[i]f Carmack's bill of lading requirement did not refer to the initial carrier, but rather to any [rail or motor] carrier that in the colloquial sense received the property from another carrier, then every carrier during the shipment would have to issue its own separate bill," which would be contrary to the purpose of Carmack. *Id.* at 2443 (internal quotations omitted).

### 2. COGSA

In contrast with Carmack, which was enacted to regulate bills of lading for domestic rail and motor carriers, COGSA serves as the governing statutory regime for all bills of lading issued by ocean carriers engaged in foreign trade "to or from ports of the United States . . . ." 46 U.S.C. § 30701. Given the regularity of intermodal shipping contracts in the contemporary age of international commerce, courts often confront COGSA and Carmack as two competing and mutually exclusive statutory regimes in maritime breach of contract cases. *See, e.g., Am. Home Assurance Co. v. Panalpina, Inc.,* No. 07 Civ. 10947, 2011 WL 666388, *2–*4 (S.D.N.Y. Feb. 16, 2011).

COGSA contains two provisions of particular relevance to this case. First, COGSA both permits and promotes forum selection clauses similar to the one in the Bill at issue. *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 528, 534, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (holding that arbitration clause in bill of lading under COGSA was presumptively enforceable); *Am. Int'l Group Eur., S.A. v. Franco Vago Int'l,* 756 F.Supp.2d 369, 376–77 (S.D.N.Y.2010) (citation omitted) (extending presumption of enforceability of arbitration clauses to forum selection clause in contract dispute governed by COGSA); *Asoma Corp. v. M/V*

*SOUTHGATE,* No. 98 Civ. 7407, 1999 WL 1115190, *2 (S.D.N.Y. Dec. 7, 1999) (citations omitted) (noting that "countless courts" have honored forum selection clauses in bills of lading subject to COGSA.). Additionally, COGSA imposes a one-year statute of limitations consistent with the Bill's Time Bar Clause. *See* 46 U.S.C. § 30701(3)(6) ("In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered[.]").

By its own force, COGSA applies to damage that occurs during "the period from the time when the goods are loaded on to the time when they are discharged from the ship." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines, Ltd.,* 230 F.3d 549, 557 (2d Cir.2000) (*quoting* 46 U.S.C. § 30701(1)(e) ("§ 30701(1)(e)")). However, COGSA expressly allows a carrier and a shipper to agree that the statute's terms will apply outside of the period of carriage laid out in § 30701(1)(e) to times "prior to the loading on and subsequent to the discharge from a ship" carrying the goods, so that, COGSA may additionally govern inland transport. *Id.* at 557 (citations omitted).

Federal maritime case law strongly encourages enforcing such extensions of COGSA's authority to inland carriage in maritime bills of lading incorporating both sea and inland transport. *See Norfolk S. Ry. v. Kirby, Pty Ltd.,* 543 U.S. 14, 29, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (internal citations omitted) (expressing support for "the liability regime Congress established in COGSA . . . [which] gives the option of extending its rule by contract . . . to the entire period in which the [goods] would be under [a carrier's] responsibility, including the period of the inland transport."). Contractual arrangements to broaden COG-

SA's terms to cover inland carriage in a through bill of lading further "the apparent purpose of COGSA ... to facilitate efficient contracting in contracts for carriage by sea." *Id.* at 29, 125 S.Ct. 385. Furthermore, such contractual provisions "protect the uniformity of federal maritime law" and simplify the law in through-bill disputes, as "confusion and inefficiency will inevitably result if more than one body of law governs a given contract's meaning." *Id.*

## B. *ANALYSIS OF THE GOVERNING LAW IN THIS CASE*

Siaci's textual arguments that the Insured and Defendants contracted into Carmack liability for Ironbound's motor carriage are unavailing. COGSA exclusively defines Defendants' liability for the alleged loss of cargo between New York and New Jersey for two independent reasons. Not only does the Bill's Paramount Clause expressly extend COGSA to inland transportation, but Defendants also fail to meet the criteria for "receiving carriers" as required in order for Carmack to control. *Regal–Beloit,* 130 S.Ct. at 2443.

### 1. *The Paramount Clause Extends COGSA to Inland Carriage*

The Bill's Paramount Clause states that COGSA will govern "for the time the Goods are in the possession of the Carrier or its subcontractors, including the time following receipt prior to loading and following discharge prior to delivery." (Docket No. 20). This provision represents an unequivocal expansion of COGSA beyond the statute's default maritime authority to control the liability of Ironbound.

First and foremost, the extension is unambiguous as a matter of plain language. The Paramount Clause articulates an expansion of COGSA to "subcontractors" of the maritime carrier and invokes the language in § 30701(1)(e) that establishes the typical boundaries of COGSA's application, extending those boundaries to times "prior to loading" and "following discharge." (*See id.*). Second, as explained below, Carmack does not apply to inland transit, so it is not surprising that the Paramount Clause would extend COGSA to that portion of shipments.

Siaci argues that the meaning of § 13.2(C) is unclear. Section 13.2(C) states that "[w]here it can be proven that the stage of carriage where the loss or damage occurred was the carriage by sea ... [liability] shall be determined according to ... [the Paramount Clause]." (*Id.*). Siaci contends that the Paramount Clause should be interpreted as controlling only sea carriage, and not inland transport, due to the canon of interpretation that "the mention of one thing implies the exclusion of the other." *Layzer v. Leavitt,* 770 F.Supp.2d 579, 586 (S.D.N.Y.2011) (*quoting Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 221 (2d Cir.2009)).

Ambiguities in a bill of lading should be interpreted against the carrier, as such contracts are considered to be "contracts of adhesion." *Monica Textile Corp. v. S.S. Tana,* 952 F.2d 636, 643 (2d Cir.1991) (*quoting Mitsui & Co. v. Am. Exp. Lines, Inc.,* 636 F.2d 807, 822–23 (2d Cir.1981)). However, the Court does not find that § 13.2(C)'s language is sufficiently vague to warrant a construction that completely vitiates the plain meaning of the Paramount Clause. In *Sony Computer Entertainment Inc. v. Nippon Express U.S.A., Inc.,* the court faced a contractual clause with language substantially similar to that of the Paramount Clause here. *See* 313 F.Supp.2d 333, 336 (S.D.N.Y.2004). The court read the clause as broadening COGSA's application to non-sea carriage, even though the bill of lading, like the Bill here, specifically referenced COGSA as the

governing law for at-sea carriage, while merely stating that the "applicable law" of the United States would govern for non-sea carriage. *Id.* at 336–37.

In sum, the Court finds that the Insured and Defendants contracted to expand COGSA to Ironbound's carriage from New York to New Jersey. Consistent with the Supreme Court's decision in *Kirby*, 543 U.S. at 27–28, 125 S.Ct. 385, this Court will enforce the Paramount Clause's extension of COGSA.

### 2. *Ironbound and Danmar Are Not Receiving Carriers*

Danmar transported the Insured's goods in France between St. Quentin and the port of Le Havre, and subsequently by ocean liner to the port of New York. During the last leg of the journey, when Siaci claims they were stolen, Ironbound transported the goods in the United States to Dayton, New Jersey by motor vehicle.

■ Carmack cannot possibly govern the Bill because neither Danmar nor Ironbound qualifies as a "receiving carrier." *Regal–Beloit*, 130 S.Ct. at 2443. Whereas Danmar never transported goods within the United States, Ironbound's shipment started in France, which means it was not the initial carrier.

Considering intermodal shipments under a single through bill of lading, courts routinely reject the proposition that Carmack governs any leg of the journey. *See Mitsui Sumitomo Ins. Co. v. Evergreen Mar. Corp.*, 621 F.3d 215, 217–18, 220 (2d Cir. 2010) (declining to apply Carmack to ocean carrier bringing goods from Japan to United States and to rail carrier carrying them from Los Angeles to North Carolina when single bill of lading encompassed carriage obligations of both); *Royal & Sun*, 612 F.3d at 141, 146 (holding that because none of three carriers bound by same through bill—one carrying goods between

Germany and Virginia and other two between destinations within United States—were "receiving carriers," Carmack did not apply); *Sompo Japan Ins. Co. v. Union Pac. R.R.*, 388 Fed.Appx. 76, 77–78 (2d Cir.2010) (finding that Carmack did not govern liability of rail carrier shipping goods from Washington to Illinois in midst of international shipment integrating all legs of transport into single bill of lading). Given that these cases' operative facts mirror the facts of Siaci's case, Carmack cannot apply here.

Lastly, § 13.2(B) employs language nearly identical to that found in the bill of lading which the Second Circuit analyzed in *Royal & Sun*, 612 F.3d at 146. The Second Circuit concluded that such language expressed a rejection of Carmack's authority, and the Court sees no reason to depart from that conclusion here. *Id.* at 146–47.

### C. *VALIDITY OF THE BILL'S FORUM SELECTION AND TIME BAR CLAUSES*

Because COGSA applies to this action, the Bill's Forum Selection Clause and Time Bar Clause are presumptively valid. *See* 46 U.S.C. § 30701(3)(6) (imposing one-year statute of limitations for bringing a claim under COGSA); *Franco Vago Int'l*, 756 F.Supp.2d at 376–77 (enforcing forum selection clause in bill of lading governed by COGSA).

As already explained, under COGSA, suit must be brought "within one year after delivery of the goods or the date when the goods should have been delivered[.]" *See* 46 U.S.C. § 30701(3)(6). The Time Bar Clause likewise states that the statute of limitations for loss or damage under the Bill runs within one year of the same incidents. Because the Time Bar Clause mirrors COGSA's statute of limita-

tions, and because COGSA governs the Bill, the Court honors the Time Bar Clause.

The Insured's cargo should have been delivered on January 17, 2011, and Siaci did not file until February 2, 2012. Siaci's suit against Defendants is therefore time-barred, and the Complaint is dismissed. The Court need not interpret and apply the Forum Selection Clause since the Time Bar Clause is dispositive.

Motions to dismiss have not been filed for the following remaining claims: (1) the Third–Party Complaint (Docket No. 9); (2) Danmar and Ironbound's cross-claims against one another ("the Cross–Claims") (Docket Nos. 5, 13); (3) Hapag–Lloyd and Hapag America's joint counterclaim against Ironbound ("the Counterclaim") (Docket No. 16). On the basis that they are claims for indemnity against the loss of the Insured's cargo and are thus rendered moot by the Court's dismissal of Siaci's Complaint, the Court also dismisses the Third–Party Complaint, the two Cross–Claims, and the Counterclaim.

### III. ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 21) of defendant Ironbound Express, Inc. to dismiss the Complaint (Docket No. 1) of plaintiff Siaci Saint Honore as subrogee of LVMH Fragrances and Ideal Logistics is **GRANTED;** it is further

**ORDERED** that the motion (Docket No. 20) of defendant Danmar Lines Ltd. to dismiss the Complaint of plaintiff Siaci Saint Honore as subrogee of LVMH Fragrances and Ideal Logistics is **GRANTED;** it is further

**ORDERED** that the complaint (Docket No. 9) of defendant Danmar Lines Ltd. against third-party defendants Hapag–Lloyd Aktiengesellschaft, Hamburg and Hapag–Lloyd (America), Inc. is **DISMISSED;** it is further

**ORDERED** that the cross-claim (Docket No. 5) of defendant Danmar Lines Ltd. against defendant Ironbound Express, Inc. is **DISMISSED;** it is further

**ORDERED** that the cross-claim (Docket No. 13) of defendant Ironbound Express, Inc. against defendant Danmar Lines Ltd. is **DISMISSED;** it is further

**ORDERED** that the counterclaim (Docket No. 1.6) of third-party defendants Hapag–Lloyd Aktiengesellschaft, Hamburg and Hapag–Lloyd (America), Inc. against defendant Ironbound Express, Inc. is **DISMISSED.**

**SO ORDERED.**